No. 19,988.

THE COLORADO ANTI-DISCRIMINATION COMMISSION, ET AL.,
v. J. L. CASE, ETC., ET AL.

(380 P. [2d] 34)

Decided December 17, 1962. Rehearing denied April 8, 1963.

236

Mr. Duke W. Dunbar, Attorney General, Mr. Frank E. Hickey, Mr. Clifton A. Flowers, Assistant, Mr. Wendell P. Sayers, Assistant, for plaintiff in error.

Mr. James E. Tarter, Mr. Weldon M. Tarter, for defendants in error.

Mr. Robert W. Johnson, for Intervenor The Colorado Springs Board of Realtors, Inc.

Mr. Edward H. Sherman, Mr. Edwin M. Sears, Mr. John E. Gorsuch, Mr. John L. Ferguson, Mr. Dwight D. Murphey, Messrs. Donaldson, Hoffman & Goldstein, Mr. Charles Rosenbaum, Mr. Mandel Berenbaum, Mr. Louis G. Isaacson, Mr. Joseph Mosko, Mr. James Radetsky, Mr. Stanton Rosenbaum, Mr. Walter M.

SIMON, of the Colorado Bar, Denver. Mr. CLINTON M. COLE, Mr. ALFRED AVINS, of the Colorado Bar, Colorado Springs. MR. ARNOLD FOSTER, Mr. PAUL HARTMAN, Mr. SOL RABKIN, Mr. EDWIN J. LUKAS, Mr. THEODORE LESKES, of the New York Bar, Amici Curiae.

*En Banc.*

MR. JUSTICE MOORE delivered the opinion of the Court.

THE issues to be determined by this Court are raised by the original parties to the proceedings before the Colorado Anti-Discrimination Commission. James R. and Elizabeth O. Rhone, to whom we will refer as the Rhones or complainants, filed a complaint before said commission against J. L. Case and Company in which it was alleged, inter alia:

"1. That Respondent has violated the Colorado Fair Housing Act of 1959 by refusing to sell certain real estate property located at 1609 Kingsley Drive, Colorado Springs, Colorado, to the Complainants because they are Negroes.

"2. That on or about September 10, 1959, Respondent and Complainants agreed upon terms of purchase and sale of said property.

"3. That on or about September 10, 1959, Respondent accepted Complainants' promissory note in the amount of Five Hundred Dollars ($500.00) as down payment to bind the contract of purchase and sale; and that the said promissory note for Five Hundred Dollars ($500.00) was redeemed on or about September 12, 1959, by Complainants' personal check.

"4. That subsequent to the execution of said contract for the purchase and sale of said property Respondent endeavored to persuade Complainants to withdraw their offer to purchase said property.

"5. That on or about September 14, 1959, Respondent

told Complainants that said property had been sold to another purchaser."

This complaint was filed September 18, 1959. Twenty-five days thereafter Nelson Merrell and Reuben M. Stovern were made additional respondents by the filing of an amendment to the original complaint. This amendment contained the following allegations:

"1. That Nelson Merrell and Reuben M. Stovern, whose business address is 29 East Platte Avenue, Colorado Springs, Colorado, and who are engaged in the business of selling real estate for the J. L. Case and Company, Realtor, who is named as Respondent in the original part of the complaint, did aid and abet said Respondent in his refusal to sell the property located at 1609 Kingsley Drive, Colorado Springs, Colorado, to Complainants, although said Complainants had made a bonafide offer to purchase said property on terms and at a price specified by Nelson Merrell, because they are Negroes.

"2. That Nelson Merrell endeavored to coerce Complainants to withdraw their offer to purchase the said property at 1609 Kingsley Drive, Colorado Springs, Colorado, by methods of persuasion and coercion.

"3. That Reuben M. Stovern purchased the said property at 1609 Kingsley Drive, Colorado Springs, Colorado, on September 14, 1959, for less money than Complainants had offered for it and at a time when Complainants' offer to purchase, together with their check for Five Hundred Dollars ($500.00), was on file in the J. L. Case and Company, Realtor, office.

"4. That at no time prior to the transfer of the property to Reuben M. Stovern did Respondent, or anyone from his office, notify Complainants, nor indicate to them in any manner, that their offer was not acceptable."

The complaint as amended was based on an alleged

violation of the Colorado Fair Housing Act of 1959 which provides in pertinent part:

"(1) (a) It shall be an unfair housing practice and unlawful and hereby prohibited:

(b) For any person having the right of ownership, or possession, or the right of transfer, rental, or lease of any housing: To refuse to transfer, rent, or lease, or otherwise to deny to or withhold from any person or persons such housing because of race, creed, color, sex, national origin or ancestry; to discriminate against any person because of race, creed, color, sex, national origin, or ancestry in the terms, conditions, or privileges pertaining to any housing, or the transfer, rental, or lease thereof, or in the furnishing of facilities or services in connection therewith; * * *

* * *

"(f) For any person to aid, abet, incite, compel, or coerce the doing of any act defined in this section as an unfair housing practice; or to obstruct or prevent any person from complying with the provisions of this article or any order issued thereunder or to attempt either directly or indirectly to commit any act defined in this section to be an unfair housing practice."

By C.R.S. '53, 69-7-3 (c) the term "Housing" as used in the Act does not include "premises maintained by the owner or lessee as the household of his family with or without domestic servants and not more than four boarders or lodgers."

Respondents filed separate answers in which they denied the allegations of the complaint as to acts violative of the statute. It was also asserted by them that the statute upon which the action was based, 69-7-1 to 7, "is in whole or in part contrary to the Constitution of the State of Colorado and contrary to the Constitution of the United States of America."

A hearing was held by the commission at Colorado Springs, March 14, 1960, and thereafter "Findings of

Fact, Conclusions of Law, and Order" were entered. The findings of fact were detailed and specific with reference to the conduct of each of the respondents. For purposes of this opinion suffice it to say that the disputed questions of fact were resolved against the respondents and the commission concluded, inter alia:

"10. That the respondent, J. L. Case, discriminated against the complainants because of their race or color in connection with the transfer of the home in question; that such discrimination constituted an unfair housing practice as defined in Section 5 (1) (a) (ii), of said Colorado Fair Housing Act of 1959.

"11. That the respondents, Nelson Merrell and Reuben M. Stovern, aided or abetted the respondent, J. L. Case, in discriminating against the complainants because of their race or color in connection with the transfer of the home in question; that such aiding or abetting constituted an unfair housing practice as defined in Section 5 (1) (e), of said Colorado Fair Housing Act of 1959."

The commission ordered that respondents "cease and desist from committing the aforesaid unfair housing practices." To "further effectuate the purposes" of the statute it was ordered by the commission:

"2. That the respondent, J. L. Case, doing business as J. L. Case and Company, Realtor, from the homes listed with him in his capacity as a licensed real estate broker, shall afford to these complainants the opportunity of purchasing a comparable home as the home in question in the same general neighborhood or a comparable neighborhood in Colorado Springs, Colorado, as the neighborhood in question, and under the same terms and conditions as such a home would be offered to any other person.

"3. That the respondent, J. L. Case, doing business as J. L. Case and Company, Realtor, inform the Coordinator of the Colorado Anti-Discrimination Commission within thirty days from the date of this Order, and at

thirty-day intervals thereafter, concerning the manner in which he has complied with this order.

"4. That the respondent, J. L. Case, doing business as J. L. Case and Company, Realtor, inform the Coordinator of the Colorado Anti-Discrimination Commission as soon as possible of the dates on which bona fide offers are made by said respondent to the complainants of comparable homes in the same general neighborhood or a comparable neighborhood in Colorado Springs, Colorado, as that of the home in question."

Pursuant to the statute the matter was brought before the district court of El Paso county by respondents for review of the proceedings before the Commission. Their petition for review challenges the constitutionality of the Fair Housing Act under several sections of the state and federal constitutions, to which we will hereinafter direct our attention.

Before the trial court, and here, some interested persons were permitted to intervene, and others to present briefs as amici curiae, and to appear in oral argument of the issues.

The trial court held that, assuming constitutionality of the Act, there was ample support in the evidence to justify the conclusion of the commission that respondents had violated the Act. However the court disposed of the action on the single constitutional issue embodied in the conclusions of law as follows:

"1. That *The Colorado Fair Housing Act of 1959, 1959 Session Laws, Chapter 148, Section 6 (12)* is repugnant and contrary to the *Constitution of the United States, Article XIV Section 1,* and the *Constitution of the State of Colorado, Article II, Section 25,* as it applies in this cause in that said section is set forth with such indefiniteness and uncertainty so that an intelligent man cannot discover his duty thereunder, and,

"2. That said *Section 6 (12),* supra, is repugnant and contrary to the same Articles and Sections of said Con-

stitutions in that said *Section 6 (12)*, supra, provides for an unlawful delegation of legislative authority, and,

"3. That, as a consequence, the order of defendant, Colorado Anti-discrimination Commission, entered on May 12, 1960, is a nullity and is void and should be dismissed."

C.R.S. '53, 69-7-6, deals with complaints before the commission, the investigation thereof, hearings thereon, and other procedural matters. Subsection (12) specifically relied on by the court provides:

"(12) If, upon all of the evidence at a hearing, the commission shall find that the respondent has engaged in or is engaging in an unfair housing practice as defined in this article, the commission shall state its findings of fact and shall issue and cause to be served upon such respondent an order requiring such respondent to cease and desist from such unfair housing practice and to take such affirmative action, including (but not limited to) the transfer, rental, or lease of housing; the making of reports as to the manner of compliance and such other action as in the judgment of the commission will effectuate the purposes of this article."

Counsel for the respondents, and amici curiae who take the same position, assert that the Act in question violates the following provisions of the Constitution of Colorado:

Article II, Section 14—in that the private property of respondents is taken for private use without their consent.

Article II, Section 3—which provides that: "All persons have certain natural, essential and inalienable rights, among which may be reckoned the right of enjoying and defending their lives and liberties; of acquiring, possessing and protecting property; and of seeking and obtaining their safety and happiness."

The argument is that the Act infringes on the inalienable right of respondents to select for themselves the

persons with whom they will contract, and authorizes infringement on their inalienable "civil rights in their property."

Article II, Section 25—in that the Act deprives respondents of an essential attribute of property without due process of law.

Article III, (Separation of powers of government)— in that the Act purports to delegate powers to an administrative agency which can only be exercised by the legislative or judicial branch of the government.

It is also argued that the Act in question violates the Fourteenth Amendment to the Constitution of the United States in that it denies respondents the inalienable right to freedom of contract without due process of law, and in that it denies respondents equal protection of the law by purporting to establish an unreasonable classification in the exclusion from coverage of "premises maintained by the owner or lessee as the household of his family * * * and not more than four boarders or lodgers."

Throughout the briefs which have been filed in support of the foregoing arguments we find heavy reliance on expressions such as "inalienable rights," "fundamental rights," "human right to own property," "essential attribute of property," "freedom of choice," etc. As a basis for most of the points relied on by respondents for invalidation of the Act it is assumed that the "right to dispose of one's property," to "freely alienate" the same, the "freedom of choice in the sale of one's property" and "the exercise of choice that is inherent in property rights" are absolute rights and freedoms which cannot be subjected to a legislative enactment which purports to prevent discriminations based on "race, creed, color, sex, national origin or ancestry." It is asserted that the "exercise of choice that is inherent in property rights must be left to the moral order for control rather than in the police power."

We have no hesitancy in stating that there are funda-

mental and inherent rights with which all humans are endowed even though no specific mention is made of them in either the national or state constitutions. "Truths" held to be self-evident in the language of the Declaration of Independence are that, "* * * all men are created equal, that they are endowed by their creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness * * *." Natural rights —inherent rights and liberties, are not the creatures of constitutional provisions either at the national or state level. The inherent human freedoms with which mankind is endowed are "antecedent to all earthly governments; rights that cannot be repealed or restrained by human laws; rights derived from the Great Legislator of the Universe." In the early case of *Gow v. Bingham,* 107 N.Y.S. 1011, this principle was recognized. It was there held that all men have rights which have their origin as natural rights independent of any express provision of law, and that constitutional provisions are not the sources of these rights.

The Ninth Amendment to the Constitution of the United States and Article II, Section 28, of the Constitution of Colorado, make clear that "The enumeration in this constitution of certain rights shall not be construed to deny, impair or disparage others retained by the people." A proper construction of this single sentence entitles that provision to far greater consideration in the definition of and the protection afforded to "inherent rights" than has heretofore been recognized. As stated by Patterson in his recently published book, "The Forgotten Ninth Amendment," in this single sentence it is announced that:

"(1) the individual, and not the State, is the source and basis of our social compact and that sovereignty now resides and has always resided in the individual; (2) that our Government exists through the surrender by the individual of a portion of his naturally endowed

and inherent rights; (3) that everyone of the people of the United States owns a residue of individual rights and liberties which have never been, and which are never to be surrendered to the State, but which are still to be recognized, protected and secured; and (4) that individual liberty and rights are inherent, and that such rights are not derived from the Constitution, but belong to the individual by natural endowment."

██ The Congress of the United States in passing the Enabling Act under which the State of Colorado was created was careful to require that the state constitution shall "make no distinction in civil or political rights on account of race or color, * * *." The constitutions of the state and the nation recognize unenumerated rights of natural endowment. These God-given rights should be protected from infringement or diminution by any person as well as any department of government. It is the solemn responsibility of the judiciary to "fashion a remedy" for the violation of a right which is truly "inalienable" in the event that no remedy has been provided by legislative enactment. An inherent human right will be upheld by this court against action by any person or department of government which would destroy such a right or result in discrimination in the manner in which enjoyment thereof is to be permitted as between persons of different races, creeds or color.

In the instant case the Rhones, who are Negroes, are guaranteed by Article II, Section 3, of the Constitution of Colorado that *as a part of their inalienable rights* they have the right "of acquiring, possessing and protecting property; and of seeking and obtaining their safety and happiness." Does this promise carry with it as part of the "unenumerated" inalienable rights the concept that the Negro cannot be discriminated against because of his color in his effort to "acquire, possess and protect" property? This section of the constitution is relied upon by respondents who contend that it cloaks them with a natural or inalienable right to discriminate against the

Negro on the basis of his color, and to prevent him from acquiring property in the form of a home, which certainly is an essential if one is to enjoy the rights involved in "seeking and obtaining their safety and happiness." In short, the argument is that the unenumerated "natural right of property" for which respondents contend, can be so exercised by them as to destroy the unenumerated natural right of the Negroes to seek and obtain safety and happiness and to acquire property unfettered by discriminations based on race and color.

■ We recognize that there are certain "essential attributes of property" which cannot be unreasonably infringed upon by legislative action. However there are no absolutes in these rights. As was stated by the Supreme Court of the United States in *Nebbia v. New York*, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940:

"* * * But neither property rights nor contract rights are absolute; for government cannot exist if the citizen may at will use his property to the detriment of his fellows, or exercise his freedom of contract to work them harm. Equally fundamental with the private right is that of the public to regulate it in the common interest. * * *"

Thus the constitutionally protected rights in property, for which respondents contend, are subject to regulation by a proper exercise of the police power of the state. If a statute purporting to have been enacted to protect the public health, morals, safety or common welfare, has no real or substantial relation to these objects, and for that reason is a clear invasion of the constitutional freedom of the people to use, enjoy or dispose of their property without unreasonable governmental interference, the courts will declare it void. *Chenoweth v. State Board of Medical Examiners, et al.*, 57 Colo. 74, 141 Pac. 132. It is the duty of the court to examine the act in question and to determine whether it has a substantial relation to the objects which the exercise of the police power is de-

signed to secure, and whether it is appropriate for the promotion of such objects.

 We hold that the Act here in question has a substantial relation to a legitimate object for the exercise of the police power, and that it is appropriate for the promotion of that object. We constantly speak of "equality of opportunity" as a foundation stone of the American way of life. We solemnly proclaim that "All men are created equal"; that "all men" have the inalienable right of acquiring, possessing and protecting property. We hold that as an unenumerated inalienable right a man has the right to acquire one of the necessities of life, a home for himself and those dependent upon him, unfettered by discrimination against him on account of his race, creed or color. The act of the legislature here in question is fully justified by Article II, Section 28, of the Constitution of Colorado and the Ninth Amendment of the Constitution of the United States.

As stated by Roscoe Pound in the introduction to "The Forgotten Ninth Amendment," supra;

"[It] declares that there are natural rights but makes no attempt to define those not expressly provided for in the Bill of Rights nor to provide for securing them. But the states have the attributes and powers of sovereignty so far as they have not been committed to the federal government by the Constitution. So far as inherent rights are not committed to the federal government, defining and securing them is left to the states or to be taken over by the people of the United States by constitutional amendment. Are not the Ninth and Tenth Amendments authority for state legislation to define and secure inherent reasonable expectations in life in civilized society as it is today and is not the Ninth Amendment a challenge to the states to undertake that work as the conditions of American life today may demand it?"

In this state the legislative branch of the government

has seen fit to accept the "challenge" referred to by Dean Pound.

When, as at present, the entire world is engulfed in a struggle to determine whether the American concept of freedom with equality of opportunity shall survive; when tyrannical dictators arrayed against this nation in the struggle proclaim throughout the world, with some justification, that we do not practice what we preach, and that "equality of opportunity" is a sham and a pretense, a hollow shell without substance in this nation; we would be blind to stark realities if we should hold that the public safety and the welfare of this nation were not being protected by the Act in question. Indeed, whether the struggle is won or lost might well depend upon the ability of our people to attain the objectives which the Act in question is designed to serve.

We might lengthen this opinion with citations to numerous decisions of courts of last resort throughout the nation, but no good purpose would be served thereby. The recent opinion of the Supreme Court of Massachusetts in *Massachusetts Commission Against Discrimination, et al., v. A. J. Colangelo, et al.,* 344 Mass. 387, 182 N. E. (2d) 595, contains a collection of numerous cases bearing upon the questions raised in the instant case. The conclusions reached by that court are sound. There is no difference in the substance of the statute under consideration in that case, nor in the facts there under consideration upon which to distinguish that case from the instant.action. All the grounds upon which respondents rely to overthrow the statute in the instant case were argued before the Supreme Court of Massachusetts and that court held that the act of the Massachusetts legislature was constitutional. Except as hereinafter noted on the question of the validity of the particular order entered in this case, we reach the same conclusion.

It is argued at great length that the Act here in question takes private property for private use without

the consent of the owner. A sufficient answer to this contention is to direct attention to the fact that the owner of the real estate involved has announced of his own free will that he wants to dispose of his private property for the private use of a purchaser who meets the terms upon which the real estate is placed on the market. If at any time the owner changes his mind and in good faith withdraws the property from the market altogether, he is at liberty to do so. Under these circumstances his property is not taken from him for private use in violation of the constitutional provision.

We now pass to a consideration of the specific orders entered by the commission in the instant case, and to the single section which the trial court held to be unconstitutional.

As hereinabove set forth in full, C.R.S. '53, 69-7-6 (12) directs that upon finding that a respondent has violated the Act the commission *shall* issue an order: (1) "requiring such respondent to cease and desist from such unfair housing practice and to take such affirmative action, including (but not limited to) the transfer, rental, or lease of housing; * * *." The Act provides (2) that the commission has authority to order "the making of reports as to the manner of compliance" and (3) to take *"such other action as in the judgment of the commission will effectuate the purposes of this article."* (Emphasis supplied.)

It is argued that there is no valid authority in the foregoing quotations under which the commission could make the order actually entered in this case, by which respondent J. L. Case "shall afford to these complainants the opportunity of purchasing a comparable home as the home in question in the same general neighborhood or a comparable neighborhood in Colorado Springs, as the neighborhood in question and under the same terms and conditions as such a home would be offered to any other person."

■ We hold that the portion of C.R.S. '53, 69-7-6 (12) which purports to empower the commision to order "such other action as in the judgment of the commission will effectuate the purposes of this article" amounts to a delegation of legislative power contrary to the separation of powers provision of the Constitution of Colorado, and in violation of Article V, Section 1, which provides that:

"The legislative power of the state shall be vested in the general assembly consisting of a senate and house of representatives, both to be elected by the people, * * *." In Cooley's Constitutional Limitations (8th ed.) we find: "One of the settled maxims in constitutional law is, that the power conferred upon the legislature to make laws cannot be delegated by that department to any other body or authority." The opinions of this Court in the following cases make clear that the general assembly "may not delegate the power to make a law; but it may delegate power to determine some fact or a state of things upon which the law, as prescribed, depends." *Sapero v. State Board of Medical Examiners,* 90 Colo. 568, 11 P. (2d) 555; *Prouty v. Heron,* 127 Colo. 168, 255 P. (2d) 755. The legislature cannot delegate to any administrative agency "carte blanche" authority to impose sanctions or penalties for violation of the substantive portion of a statute.

■ We hold that other portions of the order entered by the commission were in excess of any authority which it could constitutionally enter under the facts disclosed by the record before us, to-wit: All of paragraph "2" of the order which is hereinabove set forth in full; that portion of paragraph "3" of said order requiring that respondent Case inform the commission "at thirty-day intervals thereafter, concerning the manner in which he has complied with this order"; and all of paragraph "4" of said order.

We hold further that the portion of the Act which authorizes the commission to enter an order "requiring

such respondent * * * to take such affirmative action, including (but not limited to) the transfer, rental, or lease of housing; * * *" is of necessity limited to the areas specifically mentioned notwithstanding the attempt, by parenthesis, to give an unlimited power to order sanctions and fashion remedies of the commission's own making.

We hold that under the pronouncement of this Court in *Denver v. Lynch,* 92 Colo. 102, 18 P. (2d) 907, the illegal portions of subsection 12 are clearly severable from the Act as a whole. It is not necessary that the Act as a whole be stricken, nor is it necessary to vacate the order of the commission in its entirety. Those portions of the order which are based on an unconstitutional delegation of power, as specifically identified above, are to be stricken, and that which remains should be upheld.

The cause is remanded for the entry of judgment consistent with the views herein expressed.

MR. JUSTICE FRANTZ and MR. JUSTICE PRINGLE specially concur.

MR. JUSTICE HALL dissents.

MR. JUSTICE FRANTZ specially concurring:

Our pronouncement this day is on the side of history. What we have here said is in harmony with eternal principles to which the founding fathers pledged fealty in simple, noble language in the Declaration of Independence. For it is historical fact that Colorado's statehood marks the first fulfillment of these principles.

The Thirteenth, Fourteenth, and Fifteenth Amendments to the Federal Constitution were adopted respectively on December 18, 1865, July 28, 1868, and March 30, 1870. They are known as the Civil War Amendments, since they were the product of that tragic, intestine conflict. Each of these amendments, in practically uniform language, provides that "Congress shall have power to

enforce this article by appropriate legislation." Art. XIII, Sec. 2; Art. XIV, Sec. 5; Art. XV, Sec. 2, U. S. Const.

In summary, Article XIII provided for the entire emancipation of slaves; Article XIV defined citizenship and prohibited the states from abridging the privileges or immunities of citizens, from depriving persons of life, liberty or property without due process of law, or from denying to persons the equal protection of the laws; and Article XV forbade the United States or any state to deny or abridge the right of anyone to vote on account of race, color, or previous condition of servitude.

Such was the anatomy of the Federal Constitution when the people of Colorado sought admission to the Union as a state. It is a memorable fact that we were the first to seek and achieve statehood after the adoption of these amendments.

In its consideration of the application for statehood, Congress was conscious of the sanction of these amendments that it "enforce [these articles] by appropriate legislation." It passed an Enabling Act authorizing the formation of the State of Colorado, and empowering the Convention to form a constitution and state government, "provided, that the constitution shall be republican in form, and make no distinction in civil or political rights on account of race or color, except Indians not taxed, and not be repugnant to the constitution of the United States and the principles of the declaration of independence . . ." Section 4.

For the purposes of this case, it should be observed that our constitution must not make any distinction in civil or political rights on account of race or color and it must not be repugnant to the Constitution of the United States nor to the principles of the Declaration of Independence. These several conditions at once somewhat overlap, but in doing so, leave no doubt that Congress had hearkened to the power vested in it to enforce the three amendments and had sought to fully execute them.

Awareness of the right of Congress "to enforce" the amendments "by appropriate legislation" is reflected in the debate concerning the Enabling Act. (Vol. 3, part 3 and appendix, 43rd Cong. Rec. 2nd Sess., pages 1671 to 1690.) This excerpt from the argument of Senator Sargent proves the point:

"The Senator from Maryland says that this provision requiring that the new State's constitution shall make no distinction in civil or political rights on account of race or color is now for the first time raised in reference to any new State. This is very true. * * * [I]n 1868 the Fourteenth Amendment was ratified, and consequently Congress now has the right, and it is its duty, to insist that a constitution shall be thoroughly republican in form; that is to say, it shall see that there are none of these discriminations. . . ."

Actually, that which was epitomized in the Declaration of Independence found more particular expression in the Thirteenth, Fourteenth and Fifteenth Amendments; these amendments are reaffirmations of the tenets of the Declaration of Independence. Whether we look to the express words of the Enabling Act commanding that rights cannot be made to depend upon race or color, or to the mandate therein that our constitution must abide the Federal Constitution in which the Thirteenth, Fourteenth and Fifteenth Amendments contain the same idea, or to the principles of the Declaration of Independence, the Convention for statehood would have reached the same result.

To comply with the Enabling Act, the Convention had to defer to the Declaration of Independence, and in so doing recognized certain self-evident truths: "that all men are *created equal;* that they are *endowed* with certain unalienable rights; that *among* these are life, liberty and the pursuit of happiness. That *to secure these rights,* governments are instituted among men . . ." (Emphasis supplied.)

Some pertinent observations evolve from the quoted portion of the declaration. It would appear that accidental differences arising from the presence or absence of pigment in the skin does not affect equality. The word "among" in context signifies that basic rights other than those mentioned exist. And among such unenumerated rights would be the right of enjoying political, social and legal equality, particularly as such equality would safeguard the dignity of the human person. To secure these "endowed" rights, whether enumerated or not, governments are brought into being.

Thus, the Enabling Act carried into effect the constitutionally declared policy of the Union. Obedient to the Enabling Act, its letter and spirit were realized in the Colorado constitution.

Here is the bill of particulars:

Art. II, Sec. 3: "That all persons have certain natural, essential and inalienable rights, among which may be reckoned the right of enjoying and defending their lives and liberties; that of acquiring, possessing and protecting property; and of seeking and obtaining their safety and happiness."

Art. II, Sec. 26: "That there shall never be in this state either slavery or involuntary servitude. . . ."

Art. II, Sec. 27: "Aliens, who are or may hereafter become bona fide residents of this state, may acquire, inherit, possess, enjoy and dispose of property, real and personal, as native born citizens."

Art II, Sec. 28: "The enumeration in this constitution of certain rights shall not be construed to deny, impair or disparage others retained by the people."

Art. VII, Sec. 1: "Every person over the age of twenty-one years, possessing the following qualifications, shall be entitled to vote at all elections: He or she shall be a citizen of the United States, and shall have resided in the state twelve months immediately preceding the election at which he offers to vote, and in the county,

city, town, ward or precinct, such time as may be prescribed by law."

Art. IX, Sec. 8: "* * * No sectarian tenets or doctrines shall ever be taught in the public schools, nor shall any distinction or classification of pupils be made on account of race or color."

Thus, Colorado satisfied the requirements of the Enabling Act. It should be noted that some of these constitutional provisions are affirmative, others negative or prohibitory. But all state a policy against discrimination on account of race or color.

The act in question is consonant with such policy. It is the latest chapter in the history of Colorado, dealing with race and color, commencing with the Civil War.

Mr. Justice Pringle specially concurring:

I am in accord with the views expressed by Mr. Justice Moore in the majority opinion of the Court.

As was pointed out in *Jones v. Haridor Realty Corp.*, (N.J.) 181 A (2d) 481 (decided May 21, 1962), which dealt with the New Jersey Fair Housing Act, courts are required to respect and sustain the exercise of police power by the legislature where it seeks to apply remedial measures to conditions deemed detrimental to the welfare of the people, and where such measures are reasonably related to the objectives sought to be attained and are not clearly arbitrary. In such circumstances the questions of policy, wisdom and expediency of such measures are questions for the legislative and not the judicial branch of the government.

The Colorado Legislature has spoken with respect to the exercise of this power in dealing with discrimination in housing. The obvious effect upon the welfare of the people of the state as the result of discrimination because of race, color, religion or creed is well stated by Judge Francis, speaking for the entire New Jersey Court in *Jones v. Haridor,* supra at page 485, and the prohibi-

tion of such discrimination could well bring about substantial progress toward the elimination of such deleterious situations.

As pointed out by the majority opinion here and in *Jones v. Haridor,* supra, and the cases cited therein, the right of an owner to use his property as he wishes is not absolute. It is, and always has been, subject to reasonable restraint under the police power so long as the exercise of such power bears a reasonable relation to the public health, safety and welfare, such I believe to be the case here.

I would also clarify my position with respect to Section 2 of the order issued by the Commission requiring the respondents to afford to the complainants the opportunity of purchasing a comparable home in the same general neighborhood or a comparable neighborhood in Colorado Springs, and under the same terms and conditions such housing would be offered to any other person.

The findings of the Commission, amply supported by the testimony, show that respondents were engaged in practices prohibited by the Fair Housing Act, specifically, in that they refused to sell the property in question to the complainants Rhone solely because of their race. While guarantees that other prospective purchasers from the respondents would not be subjected to similar discriminatory action are proper, relief can and should be afforded to the complainants where possible so that they may be permitted to exercise their rights as citizens of this country.

I am of the opinion that if there was evidence in the record to support such order, then the affirmative portion of the order set forth in Section 2 was quite within the provisions of Section 12 of the Fair Housing Act, which the Court finds constitutional, that is, that portion of Section 12 which empowers the Commission to "take affirmative action (* * *) including the transfer, rental or lease of housing." There is, however, no evidence in

this record that respondents had comparable homes listed in the same neighborhood or in comparable neighborhoods, and I would therefore hold that under the state of this record the order was too broad. I do not understand that the majority opinion is in disagreement with my view, but I would clearly point out my reasons for concurring in the striking of paragraph 2 of the order.

Mr. Justice Hall dissenting:

I dissent from that portion of the majority opinion which holds that some portions of the Colorado Fair Housing Act of 1959 are constitutional.

The ultimate goal of the act is to enable a private individual to acquire the property of another without the consent of and contrary to the wishes of the owner of the property.

Such legislation, in my humble opinion, has as its goal the accomplishment of that which Article II, Section 14 of the Constitution of the State of Colorado, in these clear words, states shall not come to pass:

"Private property shall not be taken for private use unless by consent of the owner, * * * ."

Without a doubt, the Fair Housing Act of 1959, as applied to the facts in this case, is designed to vest the Rhones with title to Case's residential property without the consent of the owner Case.

Much is said in the majority opinion and the specially concurring opinion of Mr. Justice Frantz concerning the constitutionally guaranteed right:

" * * * of acquiring, possessing and protecting property * * * ." Art. II, Sec. 3.

Just how does one go about exercising this right? For nearly two hundred years in these United States of America, one seeking to acquire property sought an owner wanting to sell, and *on complete agreement* between the parties a sale was consummated. The parties

enjoyed complete freedom of contract. The buyer could refuse to buy for any reason; the seller could refuse to sell for any reason, whimsical or otherwise.

The Fair Housing Act of 1959 and the majority opinion now change all of this and would compel Case to transfer his residential property to the Rhones, not voluntarily, but under compulsion, with sanctions that might lead to his imprisonment for failure to comply.

Just how that can be done and Article II, Section 14 of the Constitution of Colorado remain meaningful is, to me, unclear.

The majority, unwilling to rest its conclusions on the foregoing constitutional provision, and Justice Pringle in his specially concurring opinion, seek to justify the act and the action of the Colorado Anti-Discrimination Commission under the police power of the state.

Justice Pringle, in his specially concurring opinion, states:

"As pointed out by the majority opinion here and in *Jones v. Haridor, supra,* and the cases cited therein, *the right of an owner to use his property as he wishes is not absolute.* It is, and always has been, subject to reasonable restraint under the police power, so long as the exercise of such power bears a reasonable relation to the public health, safety and welfare. Such I believe to be the case here." (Emphasis supplied.)

To that language I subscribe, but point out that it has no application here. No one is complaining of the *use* made of the Case property. The complaint is that title stands in the name of Case, rather than Rhones.

I am persuaded that the name or names in which a title stands has nothing to do with the public health, safety or general welfare. It is the *use* only — not the ownership — of property that creates problems which warrant calling into play the unquestioned police powers of the state, powers necessary to protect the *public* health, *public* safety and *general* welfare. The police

powers which the majority here sanction deal, not with the use of the property, but with title only.

It is stated in the majority opinion that: " * * * We hold that as an unenumerated inalienable right a man has the right to acquire one of the necessities of life, a home for himself and those dependent upon him * * * ."

The Rhones no doubt are seeking to acquire a home; however, under the act, their right to acquire the property as an investment or for other purposes was and is just as compelling as if they were seeking a home.

The majority opinion cites as authority one case, *Massachusetts Commission Against Discrimination, et al., v. A. J. Colangelo, et al.,* (Mass.) 182 N.E. (2d) 595 (decided May 16, 1962), and states:

"We might lengthen this opinion with citations to numerous decisions of courts of last resort throughout the nation, but no good purpose would be served thereby. * * * ."

My research has uncovered the *Massachusetts* case, and none other, dealing with the problem before us. True, there are other cases involving discrimination in public housing; however, public housing cases, or cases involving public funds or benefits, present an entirely different problem than that present in the case at bar.

In *Jones v. Haridor Realty Corp.,* (N. J.), 181 A. (2d) 481 (decided May 21, 1962) it is stated:

"It is true, as Haridor and the Strausses point out, that cases involving attacks on such anti-discrimination laws are few in number throughout the country. But in the four jurisdictions where the matter has been presented, New York, New Jersey, California and Washington, the first three in the order named have sustained their constitutionality, * * * ."

The four cases referred to are:

1. *New York State Commission Against Discrimination v. Pelham Hall Apts.* (1958), 170 N. Y. S. (2d) 750, 10 Misc. (2d) 334. First, we note that this decision is

not that of a court of last resort and cannot be considered as a binding precedent. Moreover, the case deals with *possessory rights only* in "public assisted housing."

2. *Levitt & Sons, Inc., v. State Div. Against Discrim.,* etc., 31 N. J. 514, 158 A. (2d) 177, a case where the law applies only to "public assisted housing accommodations." In its opinion, the court said:

" * * * There are two questions here. The first is whether the plaintiffs' developments are 'publicly assisted housing accommodation' as that phrase is used in section 4 of the Law Against Discrimination and amplified by section 5(k) of that statute. * * * ."

The court decided that the housing in question came within the terms of the statute dealing with discrimination in "public assisted housing" and concluded that as to such housing the statute was constitutional.

3. *Burks v. Poppy Construction Company* (Cal.), 370 P. (2d) 313. Here we have another case dealing with discrimination in (a) "business establishments" and (b) "publicly assisted housing accommodations." The court decided that a *house* in a housing development was a "business establishment," and also that the property in question was a "publicly assisted housing accommodation," and that the act dealing with discrimination in dealings with that type of property was constitutional. The decision is grounded on the fact that the housing was "publicly assisted."

4. In *O'Meara v. Washington State Board Against Discrimination,* 58 Wash. 2d 793, 365 P. (2d) 1 (1961), the court, in a five to four decision, held the Washington act unconstitutional, and this in spite of the fact that the legislation in question only sought to guarantee to all "the right to secure publicly assisted housing without discrimination."

There the court said:

"The respondents' home, which was ordered sold to a Negro, is specifically protected against such an order

by amendment 9 of the Washington state constitution, which provides, *inter alia*: *'Private* property shall not be taken for *private* use * * * .'

"The act of the legislature is invalid because it derogates from this constitutional right. * * * ."

The only other case dealing with the problem which has come to my attention is *Jones v. Haridor Realty Corp.*, supra. This is the case relied upon by Justice Pringle in his specially concurring opinion. Clearly this case involved public housing. As evidence of this, the court said:

*"The entire site had Federal Housing Administration approval for home construction purposes. Haridor stipulated that it was subject to the Law Against Discrimination because it sold dwellings to buyers who financed their purchases through mortgage loans guaranteed by that Federal agency. Such use of public credit by both seller and purchaser draws the development into the category of publicly assisted housing accommodations.* * * * ." (Emphasis supplied.)

I agree that the Massachusetts case involves the same question presented in the case now before us. I find no other decided case involving this identical question.

The majority states that "The conclusions reached by their [Massachusetts] court are sound." I find nothing in the opinion in that case indicating that *Massachusetts* has any constitutional inhibition against taking private property for private use. There the court said that: " * * * Clearly there has been no taking of property in a constitutional sense. * * * ."

Be that as it may, in my opinion, if the purpose of the Colorado Fair Housing Act of 1959 is accomplished, Case will be divested of his title without his consent and title will rest in the Rhones. Such a result, in my humble opinion, would constitute a "taking of property in a constitutional sense" and in flagrant violation of Article II, Section 14 of the Constitution of the State of Colorado.

The majority opinion, coupled with that of Justice

Pringle, would nullify cherished property rights and expand the police powers to an extent that must ultimately erode all constitutional rights. Overlooked is the fact that the police power is invoked to promote the *public* welfare and not the welfare of two individuals; in this case, the Rhones.

Winking at clear constitutional provisions and giving judicial sanction to unlimited expansion of the police powers may well be forerunners of a police state.

I would declare the entire act unconstitutional as in direct violation of Article II, Section 14 of the Constitution of the State of Colorado.