TERRY, PLAINTIFF-APPELLANT, v. TOLEDO (CITY) ET, DEFENDANTS-APPELLEES.

Ohio Appeals, Sixth District, Lucas County.

No. 5770. Decided December 20, 1963.

392

*Mr. Orin C. Clement,* for plaintiff-appellant.

*Mr. Louis R. Young,* director of law, and *Mr. James W. Proctor,* assistant director of law, for defendants-appellees.

(SKEEL, C. J., of the Eighth District, YOUNGER, J., of the Third District, and BROWN, J., of the Seventh District, sitting by designation in the Sixth District.)

SKEEL, C. J. This appeal comes to this court on questions of law from a judgment entered for the defendants by the Court of Common Pleas of Lucas County. The action is one seeking to enjoin the City from effectuating a city ordinance which, by its preamble, was said to prohibit "discrimination in the sale, rental and financing of real property because of race, color, religion or national origin." The action was commenced by one alleged to be a taxpayer, who before filing the action, requested the law director of the City of Toledo to initiate an action to prohibit enforcement of the ordinance which the law director refused to do.

The petition describes the several defendants as the Mayor, the Finance Director, the Auditor, the Commissioner of the Treasury, the City Clerk, and the Secretary of the Board of Community Relations. The Board of Community Relations, as referred to in the ordinance, is the body that is to receive complaints charging unfair housing acts coming within the prohibitions of the ordinance. Except for the fact that the ordinance here under consideration provides that such board is to "(a) Formulate a plan of education to advance freedom of choice in housing for all citizens; to eliminate housing discrimination based on race, religious creed, color, national origin or ancestry; (b) To provide for fact finding hearings to adduce evidence regarding discriminatory housing patterns and practices in the community; (c) adopt such reasonable rules and procedures as are necessary to effect the broad purposes of this (Fair Housing Act) ordinance," the origin of such board, its powers and purposes, is not alleged in the petition nor is there any evidence in the record concerning it.

The petition sets out that the City of Toledo is a charter city under the Constitution and the statutes of Ohio, having all powers of local self-government. It alleges that the City Council passed an ordinance designed to prevent discrimination in the sale, rental and financing of real property because of race, color, religion or national origin and sets out such ordinance verbatim. It then ascribes meaning to the following words:

"(1) 'Person selling real property' includes:

"(a) Person selling real property.

"(b) Person who leases or rents real property in a single building consisting of five or more housing suites.

"(c) Person, who as agent for another or any corporation, association, partnership or trusteeship that performs any of the above mentioned functions.

"(2) 'Purchaser' includes any occupant, prospective occupant, lessee, prospective lessee, buyer or prospective buyer.

"(3) 'Financial institution' includes any person, partnership, association, or corporation regularly engaged in the business of lending money or guaranteeing loans on real property.

"(4) 'Discriminates or discrimination' includes any distinction or difference in treatment based on the race, color, religion or national origin of a person."

The ordinance, as set out in the petition, then provides that no person selling real property shall solely, because of race, color, religion or national origin of any person

"(a) Refuse to sell, lease, or rent any real property to a purchaser.

"(b) Evict from or deny occupancy to a purchaser of any real property.

"(c) Make any distinction, discrimination or restriction against a purchaser in the sale, rental, price, terms, conditions or privileges relating to the sale, rental, lease, occupancy of real property or in the furnishing of any facilities or services in connection therewith.

"(d) Refuse to show any real property or otherwise attempt to prevent the sale, rental, or lease of any real property to a purchaser.

"(2) No person selling real property shall publish, circulate, issue or display, or cause to be published, circulated, issued or displayed, any communication, notice, advertisement or sign of any kind relating to the sale, rental, or leasing of real property which indicates any preference, limitation, specifications or discrimination based on race, color, religion or national origin (of the applicant or applicants or their family).

"(3) No financial institution shall discriminate in the granting, withholding, extending or renewing or in the fixing of the rates, terms or conditions of any financial assistance sought by an applicant or applicants for the purchase, construc-

tion, rehabilitation, repair, or maintenance of any real property or improvements thereon because of the race, color, religion or national origin of the applicant or applicants or their family.

"(4) No person or persons shall conspire, assist, induce, incite, or coerce another person to commit an act or engage in a practice that violates this section nor engage in economic or other reprisals against a person or business firm for complying with this act."

SECTION 3-41-17. Administration.

In the administration of this ordinance the Board of Community Relations, in addition to any powers heretofore conferred in this Board, shall have the power to:

(a) Formulate a plan of education to advance freedom of choice in housing for all citizens to eliminate housing discrimination based on race, religious creed, color, national origin or ancestry.

(b) To provide for fact finding hearings to adduce evidence regarding discriminatory housing patterns and practices in the community.

(c) Adopt such reasonable rules and procedures as are necessary to effect the broad purposes of this ordinance.

SECTION 3-41-18. Compliance.

(a) A complaint of alleged discriminatory housing practices prohibited by this ordinance shall be in writing, signed by the complainant, and filed in the office of the Board of Community Relations. Upon receipt of a complaint, the Secretary of the Board of Community Relations or a member of his staff shall make an investigation thereof. Upon completion of the investigation, the complaint, along with the results of the investigation, and any records, papers, or statements pertaining thereto shall be transmitted to the Fair Housing Board for its consideration without recommendation unless requested by the said Board.

(b) There is hereby created a Fair Housing Board which shall consist of nine (9) members, all of whom shall be electors of the City of Toledo and which shall be appointed by the Mayor, subject to the approval of the Council. Three (3) of said members shall be persons engaged in the real estate, home building or home financing businesses and three (3) persons identified

with racial or religious minority groups and the remaining three (3) shall be selected from the public at large. Terms of such members shall be for one (1) year and vacancies may be filled in the same manner in which original appointments are made. The Board shall designate one of its members as Chairman.

(c) The Fair Housing Board shall have the power to engage in conciliation efforts, determine facts, hold hearings and otherwise attempt to resolve complaints filed under this ordinance. It shall maintain records of its proceedings. It shall adopt reasonable rules to govern its procedures.

The petition alleges that the ordinance is an attempt by the Council to limit and restrict the inherent right to own, sell, lease or otherwise dispose of real property. That its passage is an attempt to coerce property owners through the operation of the Board of Community Relations and the Fair Housing Board into compliance with the prohibitions as set out in the ordinance. It is alleged that the City of Toledo, under the laws of Ohio and its charter, is devoid of any grant of power to adopt the above legislation and to place a restriction on the owners of the character of real estate therein defined by restricting with whom such owner or his agent may deal in selling or leasing such property. That the ordinance in seeking to restrict the legal rights of an owner of real property to deal in a sales transaction with regard to real estate with persons of his choice is violative of Art. I, Sec. 19, Ohio Constitution. It is further alleged that the defendants, unless enjoined, will attempt to put into effect the provisions of the ordinance which will require the expenditure of public funds for an invalid purpose. The plaintiff prays that the defendants be enjoined from proceeding under the provisions of the ordinance.

The answer of defendants admits the allegations of the petition describing the several defendants, and the passage of the ordinance as set out in the petition. The defendants then deny each and all of the allegations of plaintiff's petition.

The case was tried on the pleadings and stipulations of fact filed with the papers in the case. The stipulations put in evidence the Charter of the City of Toledo and the Ordinance (682-61) as pleaded and admitted by the pleadings. It is also

stipulated that plaintiff is the owner of property described in the stipulations and is a taxpayer in Toledo and in Lucas County. It is finally stipulated that the case is to be tried on the stipulations and the briefs of the parties. It must be observed that the trial court could not consider any statement of fact found in the briefs not in the stipulations of fact or admitted by the pleadings as evidence. Some extraneous matter is found in the briefs which will be disregarded on this appeal.

From the judgment entered for the defendants, the plaintiff-appellant claims the following errors:

"I. The trial court erred in holding and deciding that the City of Toledo was within the scope of its powers in passing Ordinance Number 682-61.

"II. The trial court erred in holding and deciding that Ordinance Number 682-61 is a valid and constitutional exercise of the police power in public interest and welfare.

"III. The trial court erred in holding and deciding that Ordinance Number 682-61 does not deny Plaintiff-Appellant liberty of contract.

"IV. The trial court erred in holding and deciding that there was no unlawful delegation of legislative power in Ordinance Number 682-61.

"V. The trial court erred in holding and deciding that there was no unlawful delegation of judicial power in Ordinance Number 682-61.

"VI. The trial court erred in holding and deciding there was no misapplication of public funds involved in Ordinance Number 682-61."

The only power vested in the Fair Housing Board is to engage in conciliation efforts, determine facts, hold hearings and otherwise attempt to resolve complaints filed under this ordinance. It is required to maintain records of its proceedings and adopt reasonable rules to govern its procedures. It is not granted power to enforce its conclusions nor is there any right conferred upon either the Community Relations Board or the Fair Housing Board to require the attendance of witnesses upon hearings. Nor is the manner of prosecuting an inquiry provided. A reading of the ordinance clearly demonstrates that it is so indefinite and uncertain in the manner

in which either board is to proceed that the enforcement of the provisions of the ordinance is impossible. Therefore, the trial court was in error in holding that private property owners could be subjected to prosecution or forced to act upon the board's conclusions after being subjected to a hearing upon a complaint filed with the Community Relations Board. There are two basic reasons for this conclusion. First, there is no power vested in the Fair Housing Board to require the attendance of witnesses or to take testimony under oath. Second, there are no penalty provisions for the enforcement of its order set out in this ordinance.

There is also a serious question presented whether the ordinance violates due process in eliminating from its provisions the renting or leasing of a housing unit in a single building consisting of not more than four housing units. There is no apparent justifiable reason for placing the burden imposed upon all other real property and excepting those having less than five housing units in a single structure.

Whether or not an ordinance which compels contractual relations, regardless of the will of one of the contracting parties, can be held valid as in the exercise of the police power of the city under the provisions of its charter is not supported, with some apparent exceptions, by the citations of the appellee. Most of the Ohio cases cited have to do with gambling devices. *Benjamin* v. *City of Columbus,* 167 Ohio St., 103, 146 N. E. (2d), 854, is cited and is clearly not in point. The case of *Levitt & Sons, Inc.* v. *State Division Against Discrimination,* 31 N. J., 514, 158 A. (2d), 177 (1960), cannot be considered in support of appellees' contentions. The New Jersey Act there considered, among other things, provided, in part, that all persons must be afforded the right to obtain "all accommodations, advantages, facilities and privileges of any place of public accommodation and publicly assisted housing accommodations without discrimination because of race * * *." The holding of the court was based solely on the fact that the housing developments concerned were publicly assisted. The court stated, on page 531 of the opinion, that the plaintiffs did not argue and hence it did not decide, whether by restricting their ability to dispose of their property as they chose, the statute in question violated due process.

The case of *Colorado Anti Discrimination Commission* v. *Case*, 380 P. (2d), 34, is also cited. The defendant had been ordered to cease and desist from committing unfair housing practices. The defendant had, by contract, agreed to sell a house to the complainant and had received the complainant's note as a part payment for the property which note had been replaced by complainant's check. The transaction was not concluded because the defendant, after receiving the check, sold the property to another for a lesser consideration. The facts, therefore, justify affording the complainant a remedy for breach of contract. This, however, does not justify disregarding constitutional immunities. The court, after holding that the Fair Housing Act, in part, was a proper exercise of legislative power under its constitutional authority, held that that part of the Act which provided that the commission has authority to order "the making of reports as to the manner of compliance and (3) to take 'such other action as in the judgment of the commission will effectuate the purpose of this article,' " unconstitutional as a delegation of legislative powers. All of the relief sought by the complainant was, therefore, denied so that the court's decision on the constitutionality of the balance of the Act was unnecessary to the decision of the case. The court based its decision on the power of the legislature to enact legislation dealing with fair housing as being a proper exercise of the police power and quoted, as a foundation for such conclusion, from "The Forgotten Ninth Amendment to the Constitution" by Patterson, where, in a single sentence, it is stated:

" '(1) The individual and not the state, is the source and basis of our social compact and that sovereignty now resides and has always resided in the individual; (2) that our Government exists through the surrender by the individual of a portion of his naturally endowed and inherent rights; (3) that everyone of the people of the United States owns a residue of the individual rights and liberties which have never been, and which are never to be surrendered to the state, but which are still to be recognized, protected and secured; and (4) that individual liberty and rights are inherent and that such rights are not derived from the Constitution but belong to the individual by natural endowment.' "

Without attempt having been made to classify the rights claimed by the complainant under the IX Amendment of the Constitution of the United States, the court concludes that the Act in question has a substantial relation to a legitimate objective for the exercise of the police power and that it is appropriate for the promotion of that object. The court recognizes that ownership and possession of property by an individual is a matter of his individual concern and cannot be disturbed unless he seeks to dispose of it in which event his constitutional rights are subject to the police power of the state in providing against discrimination. The court relies, in coming to this conclusion, on the case of *Massachusetts Commission Against Discrimination* v. *Colangelo,* 344 Mass., 387, 182 N. E. (2d), 595 (1962). The question presented in the Massachusetts case was the constitutionality of an order issued under the Massachusetts Fair Housing Practice Law finding that the respondents, who were the owner and agent respectively of an apartment containing one hundred and twenty suites, were in violation of the Act by engaging in unlawful discrimination. That part of the Act said to have been violated was quoted in the opinion as follows:

" 'It shall be an unlawful practice; * * *

" '(6) For the owner, lessee, sublessee, assignee or managing agent of publicly assisted or multiple dwelling or contiguously located housing accommodations or other person having the right of ownership or possession or right to rent or lease such accommodations;

" '(a) to refuse to rent or lease or otherwise to deny to or withhold from any person or group of persons such accommodations because of the race, creed, color or national origin of such person or persons; (b) to discriminate against any person because of his race, creed, color or national origin in the terms, conditions or privileges of such accommodations or in the furnishing of facilities or services in connection therewith * * *.' "

The court held that in passing the Fair Housing Act the legislature acted within the police power of the state to accomplish a valid statutory objective. Certain conditions that might justify such legislation are asserted in the opinion on pages 599 and 600 of the 182 Northeastern 2nd Report, setting

forth three specific instances that might be the basis of such justification although there is nothing in the Act that confines its application to the conditions enumerated. The provisions of the Act apply to all residence property of the state whether or not there is suitable property available to all in the immediate neighborhood. The court also cites zoning cases in support of the right to pass Fair Housing legislation as within the exercise of the police power of the state. The purpose to be accomplished in zoning regulations is in no sense a comparable situation with that of fair housing as defined in the Massachusetts Act. Nor are the restrictions regulating business and the control of prices, including rent control, during periods of economic crisis, sufficiently analogous to give any support to the alleged right to invade the constitutionally protected right to contract and possess all the privileges incident to the ownership of property. The dissenting opinion filed in this case states by far the more logical view of the subject where, on page 606 of the 182 Northeastern 2nd Report, it is said:

"The court has, nevertheless, given its approval to the legislation without the slightest showing which would justify it even temporarily or on an emergency basis. Surely this court as the guardian of our Constitution should require more than mere legislative fiat before countenancing legislation of this character. The bare exercise of the police power by the Legislature should not, ipso facto, be held to constitute, in all cases, a legitimate exercise thereof. Thus to hold would drain the constitutional restraints of their vitality. However, in context, the fair implication of the majority opinion is that the legislative act is conclusive.

"It is also my firm conviction that the degree of interference authorized by the statute constitutes an appropriation for a public purpose of the owner's property without his consent, with no showing that 'the public exigencies require' it, and for which the owner has received no compensation whatsoever. This is in direct violation of Art. 10 of the Declaration of Rights and the Fourteenth Amendment to the Constitution of the United States.

"Finally, the commission in its order has resorted to coer-

cive measures which I think are per se both alien and inimical to the letter, the spirit and the principles of the Constitutions of our Commonwealth and our country. I would so hold."

The New York case, cited by the majority opinion, of *New York Commission Against Discrimination* v. *Pelham Hall Apartments*, 10 Misc. (2d), 347, 171 N. Y. S. (2d), 558, had to do with a statute regulating government assisted housing units and was, therefore, not authority for the all inclusive powers conferred upon the Commission in the Massachusetts case.

The case of *O'Meara* v. *Washington State Board Against Discrimination*, 58 Wash. (2d), 793, 365 P. (2d), 1, while not decided on identical grounds with those presented in the instant case holds that the Fair Housing Act of the State of Washington is unconstitutional. The Washington Act provided that there should be no racial discrimination in the sale of housing financed in whole or in part by government loan or loan guarantee or insured by a governmental agency. The primary basis of the decision holding the law unconstitutional was that for the purposes of dealing with segregation, there was no valid distinction between property financed by public assistance and that which was not. But in a concurring opinion it is made abundantly clear that the Fair Housing Act was unconstitutional as violating the right of due process of the property owner.

In final analysis, the divergence of opinion of the several courts as to the meaning to be ascribed to comparable facts as demonstrated by the foregoing cases indicates that the conclusions reached as to whether or not Fair Housing legislation is a proper exercise of the police power fails to set out a sound principle of law to guide litigants in a Fair Housing dispute. The cases are in complete confusion.

The applicable constitutional provisions of Ohio must, therefore, be examined.

Art. I, Sec. 1, provides:

"All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety."

Art. I, Sec. 19, provides:

"Private property shall ever be held inviolate but subservient to the public welfare. When taken in time of war or other public exigency, imperatively requiring its immediate seizure or for the purpose of making or repairing roads, which shall be open to the public without charge, a compensation shall be made to the owner, in money: and in all other cases, where private property is taken for public use, a compensation therefor shall first be made in money, or first secured by a deposit of money; and such compensation shall be assessed by a jury, without deduction for benefits to any property of the owner."

Certainly the right to own and possess property and exercise all privileges bestowed, including the right to sell to one of his own choice or to exercise the right to contract free of any force imposed upon him by governmental authority except as limited by a proper use by the state of the police power exercised for the protection of all of the people could not be more clearly stated.

The Supreme Court of Ohio in the case of *Palmer & Crawford* v. *Tingle*, 55 Ohio St., 423, 45 N. E., 313, had for consideration a very similar question which involved the constitutionality of a statute granting subcontractors, laborers and materialmen, a mechanics lien on the owner's property improved by the work done and materials furnished by subcontractors and by materialmen who had contractual relations with the general contractor and not the owner. The court held the law unconstitutional. Paragraph four of the syllabus provides:

"4. The act of April 13, 1894, 91 O. L., 135, in so far as it gives a lien on the propery of the owner to subcontractors, laborers and those who furnish machinery, material or tile to the contractor, is unconstitutional and void. All to whom the contractor becomes indebted in the performance of his contract, are bound by the terms of the contract between him and the owner."

and on page 441 of the opinion the court said:

"Contracts and compacts have been entered into between men, tribes and nations during all time from the earliest dawn of history, and the right and liberty of contract is one of the inalienable rights of man, fully secured and protected by our

constitution, and it may be restrained only in so far as it is necessary for the common welfare, and the equal protection and benefit of the people. That such restraint of the right and liberty of contract is for the common public welfare, and equal protection and benefit of the people must appear, not only to the general assembly, by force of popular clamor, or the pressure of the lobby, but also to the courts, and it must be so clear, that a court of justice in the calm deliberation of its judgment, may be able to see that such restraint is for the common welfare and equal protection and benefit of the people. *People* v. *Gilson*, 109 N. Y., 389; 4 Am. S. Rep., 465.''

In the case of *Miller* v. *Crawford*, 70 Ohio St., 207, 71 N. E., 631, the court held:

''The act of April 4, 1902, entitled, 'An act to prevent fraud in the purchase, disposition or sale of merchandise' (95 O. L., 96), is repugnant to the first article of the constitution because it places an unwarrantable restriction upon the right of the individual to acquire and possess property, and because it contains a forbidden discrimination in favor of a limited class of creditors.''

In order to make a contract there must be a meeting of the minds of the contracting parties. If one party is compelled to accept the offer to buy made by another under a requirement of law then the taking is by operation of law and not by voluntary agreement. After the *Palmer case*, the Ohio Constitution was amended by the enactment of Art. II, Sec. 33, which provides:

''Laws may be passed to secure to mechanics, artisans, laborers, sub-contractors and material men, their just dues by direct lien upon the property, upon which they have bestowed labor or for which they have furnished material. No other provision of the constitution shall impair or limit this power.''

This amendment forever settled any question regarding the right to provide for mechanics liens by statute. Like provisions have been passed dealing with workmen's compensation to clear up doubtful areas as to the constitutionality of some parts of the Workmen's Compensation Act prior to the Constitutional Amendment of 1912.

Certainly if an ordinance was passed prohibiting sales of

property to members of a certain class the court would strike it down. Such an ordinance or statute would be held void as an unlawful interference with the ownership of property and the right to contract. There is no evidence in this record that there is not available to all suitable and comparable property of like location, regardless of race, color, religion or national origin.

We must conclude from the foregoing consideration of the issues that the ordinance is too loosely drawn and is, therefore, unenforceable. We also find that in not affording sufficient power to conduct a proper hearing to determine rights involving real property (See Section 4112.04, Revised Code), and in delegating legislative powers to the Board of Community Relations and the Fair Housing Board to determine reasonable rules and procedures to effect the broad purposes of the ordinance and for the further reason that by its terms it eliminates from the powers and duties of the Board of Community Relations and the Fair Housing Board consideration of the applicability of the restrictions in renting real estate as to housing units in a single building containing one to four housing units, the constitutionality of the ordinance is clearly challenged. That such a provision in eliminating certain properties from the regulations of the Fair Housing Act results in the Act being unconstitutional has been recently decided by Judge Gordon H. Brown of the County Court of Bergen County New Jersey in a case concluded December 11, 1963, in which Mrs. Delia David was the complainant and the Vista Company was the defendant. The Fair Housing Act of New Jersey was held unconstitutional. The Act there considered excluded from its regulations one family units, two family units and three family units in a dwelling in which the owner maintained his family household. The decision is of such recent date that a citation is not here available.

Since the record is not sufficiently complete to pass on the question of due process, we suggest only that the right to consider the question of fair housing, as herein defined, could more effectively be dealt with by a constitutional amendment passed by a vote of the people.

The judgment is, therefore, reversed and final judgment entered for the plaintiff.

YOUNGER and BROWN, JJ., concur.