ERMON K. JONES, CLAIMANT-RESPONDENT, v. THE HARIDOR REALTY CORP. T/A ASBURY GABLES, HAROLD STRAUSS, ARTHUR C. SAMUELS, ISADORE STRAUSS, RESPONDENTS-APPELLANTS.

Argued March 20, 1962—Decided May 21, 1962.

*Mr. Arthur J. Sills,* Attorney General of New Jersey, argued the cause for respondent Division on Civil Rights, Department of Education, State of New Jersey (*Mr. Elias Abelson,* Deputy Attorney General, of counsel and on the brief).

*Mr. Charles L. Morgan* argued the cause for respondents-appellants.

The opinion of the court was delivered by

FRANCIS, J. The Commissioner of Education issued an order against the appellants, The Haridor Realty Corp., trading as Asbury Gables, Harold Strauss, Isadore Strauss and Arthur C. Samuels, for the purpose of remedying a violation by them of the Law Against Discrimination, *N. J. S. A.* 18:25–1 *et seq.* Appellants appealed to the Superior Court, Appellate Division, but before argument there the cause was certified by this court on our own motion.

Certain objections have been interposed to the procedural course pursued by appellants in seeking review in the

Appellate Division. Compare, *R. R.* 4:88–8(*a*) and *N. J. S. A.* 18:25–21. In view of the public importance of the substantive questions involved, we have concluded to pass the objections in order to reach a decision on the merits.

I.

The Haridor Realty Corp., trading as Asbury Gables, is a New York corporation registered to do business in New Jersey. At and prior to the incident which produced these proceedings, it was engaged in building one-family homes in a housing development in an area known as Asbury Gables, Monmouth County, New Jersey. The specific section of its operation appears on a land subdivision map entitled "Map of Asbury Gables West, Township of Neptune, Monmouth County, New Jersey," which was filed in the County Clerk's Office on October 3, 1957, after having been approved by the Township Committee. All or substantially all of the land covered by the map was acquired initially in the names of Harold Strauss and Isadore Strauss by deed dated November 22, 1957. During the period with which we are concerned, Harold Strauss was secretary and treasurer of Haridor and in active charge of management of the development; Isadore Strauss was the president. There is no doubt they controlled the corporation.

The entire site had Federal Housing Administration approval for home construction purposes. Haridor stipulated that it was subject to the Law Against Discrimination because it sold dwellings to buyers who financed their purchases through mortgage loans guaranteed by that Federal agency. Such use of public credit by both seller and purchaser draws the development into the category of publicly assisted housing accommodations. *N. J. S. A.* 18:25–4; *Levitt & Sons, Inc. v. Div. Against Discrimination, etc.,* 31 *N. J.* 514 (1960), appeal dismissed 363 *U. S.* 418, 80 *S. Ct.* 1257; 4 *L. Ed. 2d* 1515 (1960).

Haridor's method of operation was this: Three different types of model homes were built on the tract for inspection by prospective purchasers. The types were advertised for sale in the public press as representing houses available in Asbury Gables, a community "being developed by Isadore and Harold Strauss." And the public was told that purchases could be made with FHA mortgages. A sales office was maintained in one of the model homes where the appellant, Arthur C. Samuels, a real estate broker, acted as sales agent of Haridor. At this office the purchaser would select the type model home that appealed to him; then with Samuels' assistance he would select a location for it from the available building lots shown on the map of the development. This proceeding would be followed by the execution of the necessary papers to complete the transaction, including the FHA mortgage application (if that kind of mortgage was desired). Haridor would erect the dwelling. If the lot chosen by the purchaser was not already owned by Haridor, title was obtained from Harold and Isadore Strauss, its secretary-treasurer and president, who as individuals were the record owners of the tract. The proof shows clearly an arrangement between the individuals and their corporation whereby title to the lots would be conveyed to Haridor as they were needed to complete sales transactions with home buyers.

In June, August and October 1959, Ermon K. Jones visited the Asbury Gables development. On two occasions he was accompanied by his wife, Blanche, and one of their minor daughters. Jones talked with Samuels about the purchase of a home there, selected the type of home he liked, and requested and obtained an FHA mortgage application. The form was completed and sent to Haridor with the request for a meeting to complete the formal contract of sale. The evidence reveals beyond doubt that Jones' offer was refused because he is a Negro. It stands undenied that Harold Strauss said to an investigator of the Division on Civil Rights:

"No law or no one is going to force me to sell to a Negro a house in this development. * * * Now, if this man wants a house, let him find a plot and I'll build it for him. Before I will sell to a Negro in this development, I will close up the development."

There is no doubt of the ability of Mr. and Mrs. Jones to meet the financial obligations involved in the purchase and maintenance of the property, he being an engineer employed at Fort Monmouth, and she a teacher in the public school system in Neptune Township.

Following the refusal to sell to Jones, a complaint was filed with the Division on Civil Rights, charging violation of section 4 of the Law Against Discrimination. The section says:

"All persons shall have the opportunity to obtain all the * * * advantages, facilities, and privileges of * * * publicly assisted housing accommodation, and other real property without discrimination because of race, creed, color, national origin or ancestry, subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right." *N. J. S. A.* 18:25–4.

Hearing was held thereon and the charge of discrimination was sustained. An order was then issued by the Commissioner of Education directing Haridor to enter into a contract with Jones to sell him a house and building lot upon the terms available to all other purchasers. The order provided also that if Jones selects a lot in the development, title to which is in Harold Strauss and Isadore Strauss, they shall convey it to Haridor so that the transaction can be completed. And it directs that if, for any reason, Haridor is unable to comply with its terms, the parcel chosen by Jones in the development shall be offered for sale to him by Isadore Strauss and Harold Strauss.

On this appeal appellants attack the constitutionality of the Law Against Discrimination. In addition, Harold Strauss and Isadore Strauss assert that the Commissioner of Education has no jurisdiction over them as individuals

to support the order directing them to transfer title to a lot or lots to Haridor, or directly to Jones, if necessary, to, consummate the sale.

In *Levitt* it was held that the enactment under attack here did not transgress the equal protection clauses of the State and Federal Constitutions. Publicly assisted housing, as there broadly defined, constitutes a large segment of the housing market. When Congress entered the housing field, its purpose was "a decent home and a suitable living environment for every American family." (Housing Act of 1949, 42 *U. S. C. A.* § 1441.) In pursuit of that objective, it undertook to stimulate home building and buying by making available to those who wished to take advantage of the program, a mortgage payment guaranty, the like of which was not to be had in private business. Developers and owners who availed themselves of the assistance obtained an added advantage in the housing market which they would not otherwise enjoy. See "Minority Housing," 46 *Cornell L. Q.* 194, 236 (1961); *Report, United States Commission on Civil Rights, Housing*, 58–60 (1961). They were aided by the public credit which in the ultimate depends upon revenues of government having their source in all of the people, non-Whites as well as Whites. Such a group is sufficiently large and possessed of sufficiently similar characteristics distinguishing it from other developers and builders, and it has a sufficiently peculiar intimacy with State and Federal governmental policy of providing housing without discrimination, to justify classification by the Legislature for separate treatment. Moreover, a ban on discrimination in publicly assisted housing can be more easily enforced than such a ban on wholly private housing, since involvement of a public agency in the sale and mortgage transaction creates a greater opportunity for supervision and control of the prohibited practice. In the sense indicated, publicly assisted housing provides a reasonable basis for differentiation from housing generally. The fact that a more expansive classification might more

fully achieve the desired objective, does not cause the legislative mandate to run counter to the Constitutions of the State and Federal sovereignties. Absence of mathematical nicety or exact equality does not offend where there is some reasonable ground for the separate treatment. The wide scope of state police power will support such treatment so long as it cannot be said to be arbitrary. *Levitt, supra,* 31 *N. J.,* at *pp.* 532, 533; *Burks, Jr. v. Poppy Construction Company,* 20 *Cal. Rptr.* 609, 370 *P. 2d* 313 (*Sup. Ct.* Mar. 26, 1962); *Zehil v. Weaver,* 15 *Misc. 2d* 436, 182 *N. Y. S. 2d* 111 (*Sup. Ct.* 1958).

Primarily, however, appellants' assertion of invalidity rests in the claim that the Law Against Discrimination deprives them of property rights without due process of law in violation of the Fourteenth Amendment of the *United States Constitution.* That question was not raised in *Levitt* and therefore was not specifically decided. Enough was said, however, by way of comment to indicate the court's thinking and to point the way to the decision we now reach formally.

 There is no doubt that the right to acquire, own and dispose of real property is within the protective scope of the Fourteenth Amendment, or that such right is recognized by *Article* 1, *paragraph* 1, of our State Constitution. But the private right is not absolute. It is subject to the reasonable exercise of the police power, the reach of which is not capable of precise delineation. Exercise of that power by the State is valid so long as the regulation or limitation on the use of property bears a reasonable relation to public health, safety, morals or general welfare. In appraising the constitutionality of the particular state action, the search is for facts and factors which reveal an evil adversely affecting the public in any of the categories mentioned. Once such an evil appears, it provides the occasion for the exercise of the police power, and the issue becomes whether the means employed by the Legislature to combat, ameliorate or eliminate it are reasonably designed to that

end. If the means are reasonable (and the presumption is strong in that direction), the fact that some pecuniary detriment may fall upon individual property owners affected thereby does not signify an invasion of due process. *Levitt, supra,* 31 *N. J.,* at *p.* 531; *Burks, Jr. v. Poppy Construction Company, supra; New York State Commission Against Discrimination v. Pelham Hall Apts.,* 10 *Misc.* 2d 334, 170 *N. Y. S.* 2d 750 (*Sup. Ct.* 1958). In such case, questions of policy, wisdom and expediency are for the legislative and not the judicial branch of the government.

██ Discrimination against Negroes in the sale and rental of housing accommodations results in inadequate housing for them and in segregation in housing. They are thus compelled in large numbers to live in circumscribed areas under substandard, unhealthy, unsanitary and crowded living conditions. These conditions in turn produce disease, increased mortality, unstable family life, moral laxity, crime, delinquency, risk of fire, loss of tax revenue and intergroup tensions. See *Levitt, supra,* 31 *N. J.,* at *p.* 531; *Berman v. Parker,* 348 *U. S.* 26, 32, 75 *S. Ct.* 98, 99 *L. Ed.* 27 (1954); 5 *N. Y. City Charter & Code* § W41–1.0; *Report, United States Commission on Civil Rights, Housing, supra,* 1–4; *Report, United States Commission on Civil Rights,* 1959, *p.* 534. Standards of sanitation have to be sacrificed because strict enforcement of building and health codes will simply make a great many people homeless. See "State Action," 14 *Stan. L. Rev.* 3, 47 (1961). All of these things imperil the tranquillity of a community. In addition, substandard and segregated housing seriously complicates the problem of public school integration. Manifestly, in their totality these conditions reveal an evil which it is within the competence of the lawmakers to correct.

New Jersey has a strong policy against discrimination. It is reflected in *Article* 1, *paragraph* 5, of the 1947 *Constitution* which proscribes the denial of any civil right, or discrimination in the exercise of such right, on account of race, color, ancestry or national origin. The statute now

under attack contains a finding that such discrimination "menaces the institutions and foundation of a free democratic State." *N. J. S. A.* 18:25–3. Moreover, its purpose is expressly declared to be to implement the constitutional provision guaranteeing civil rights, and to exercise the police power to that end. *N. J. S. A.* 18:25–2.

One of the basic functions of government is to safeguard the health, safety and welfare of its people. Upon the appearance of conditions detrimental to their welfare, it has the duty to apply remedial measures. The courts in turn are required to respect and sustain such efforts as an exercise of the legislative police power so long as they are not clearly arbitrary and are reasonably related to the objective sought to be attained. Many limitations on the use of private property have been upheld under that test as legitimate efforts to improve the public weal. See "The New Jersey Housing Anti-Bias Law," 12 *Rutgers L. Rev.* 557 (1958). This power is one of the least limitable of governmental powers. *Queenside Hills Realty Co. v. Saxl,* 328 *U. S.* 80, 83, 66 *S. Ct.* 850, 90 *L. Ed.* 1096 (1946).

Plainly, prohibition of discrimination against Negroes in publicly assisted housing will bring about substantial progress toward elimination of the mischief and the distress that have been described above. The statute need not be a perfect and all encompassing remedy so long as it represents a reasonable approach toward solution of the problem. And, as has been noted with respect to the equal protection argument, when, as in the present situation, there is a fair basis for singling out the class or group affected, the regulation is constitutionally unassailable. In attempting to eliminate the practice of discrimination against minority groups, a cautious, step by step approach, which has generally characterized legislative action, does not transgress the organic law. Reform, as the United States Supreme Court said in *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 *U. S.* 483, 489, 75 *S. Ct.* 461, 99 *L. Ed.* 563 (1955), "may take one step at a time, addressing itself to the phase of the problem which

seems most acute [or more susceptible to immediate correction] to the legislative mind." And see, *Two Guys from Harrison, Inc. v. Furman,* 32 *N. J.* 199, 218–219, 229 (1960); *McGowan v. Maryland,* 336 *U. S.* 420, 425–426, 81 *S. Ct.* 1101, 6 *L. Ed.* 2d 393 (1961); *New York State Commission Against Discrimination v. Pelham Hall Apts., supra,* 170 *N. Y. S.* 2d, at *p.* 759; 12 *Rutgers L. Rev., supra,* at *pp.* 568–570. Weighing the competing interests involved here, *i. e.,* the private property right and the need for correction of the social and economic detriment to the public welfare resulting from discriminatory exercise of that right through refusal to sell privately owned but publicly assisted housing to Negroes, it cannot be said that the abridgement of the private right to the limited extent imposed by the present anti-discrimination act constitutes an unreasonable taking of property without due process.

It is true, as Haridor and the Strausses point out, that cases involving attacks on such anti-discrimination laws are few in number throughout the country. But in the four jurisdictions where the matter has been presented, New York, New Jersey, California and Washington, the first three in the order named have sustained their constitutionality, *New York State Commission v. Pelham Hall Apts.* (1958); *Levitt & Sons, Inc. v. Division Against Discrimination, etc.* (1960); *Burks, Jr. v. Poppy Construction Company* (1962), *supra.* The Washington Supreme Court, by a five to four vote, reached the contrary conclusion. *O'Meara v. Washington State Board Against Discrimination,* 365 *P.* 2d 1 (1961), *cert.* den. 369 *U. S.* 839, 82 *S. Ct.* 866, 7 *L. Ed.* 2d 843 (Apr. 2, 1962). But, like the California Supreme Court, we do not find the reasoning of the Washington majority persuasive. The dissenting opinion of Justice Rosellini discussed and agreed with the views expressed in the *Pelham Hall* and *Levitt* cases; the majority opinion mentioned *Levitt* but did not discuss or distinguish it. On review of *Levitt* and study of the due process argument now presented, we find ourselves entirely free from doubt as to

the constitutionality of our anti-discrimination statute. "Of course a State may leave abstention from such discriminations to the conscience of individuals. On the other hand, a State may choose to put its authority behind one of the cherished aims of American feeling by forbidding indulgence in racial or religious prejudice to another's hurt. To use the Fourteenth Amendment as a sword against such State power would stultify the Amendment. * * *." (Justice Frankfurter concurring in *Railway Mail Association v. Corsi*, 326 *U. S.* 88, 98, 65 *S. Ct.* 1483, 89 *L. Ed.* 2072, 2079 (1944).

## II.

■ Finally, Harold Strauss and Isadore Strauss contest validity of the order so far as it is directed against them as individuals. They allege that the corporate entity was the offending actor and it alone should be subjected to the remedy fashioned by the Commissioner of Education. We have already noted above the statement of Harold Strauss revealing his personal joinder in the discriminatory refusal to sell to Jones. Accordingly, his contention that any violation of the act was solely corporate is factually inaccurate. As to Isadore Strauss, however, there is no evidence of specific involvement in the Jones negotiations. But in the framework of the case, personal rejection of Jones, as a Negro, by either one of them, is not necessary. The *modus operandi* of the Haridor corporation and Harold Strauss and Isadore Strauss was a conscious and agreed unitary operation. Their corporation was the developer and builder; they held title to the lots as individuals and transferred it to the corporation to bring each sale to complete fruition. Neither one could, nor wished to, function without the other. Therefore, for purposes of administration of the Law Against Discrimination, they must be treated as a unit. The record does not indicate the reason why the Strausses fractioned their operation, whether it was for some purely business reason or to facilitate the practice of discrimination. But such proof is

not essential. No device, whether innocent or subtly purposeful, can be permitted to frustrate the legislative determination to prevent discrimination.

The order is in all respects affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.