81 N.J. Super. 593 (1963)
196 A.2d 286
DELIA DAVID, COMPLAINANT-RESPONDENT,
v.
VESTA COMPANY AND HENRY C. SENGER, JR., JOHN LOWE, JOSEPH T. PANUCCI AND MRS. ALFRED DAGLE, RESPONDENTS-APPELLANTS.
Superior Court of New Jersey, Bergen County Court, Law Division.
Decided December 10, 1963.
*594 Mr. Howard H. Kestin, Law Assistant to the Attorney General, argued the cause for the Division on Civil Rights, Department of Education, State of New Jersey (Mr. Arthur J. Sills, Attorney General of New Jersey, attorney).
Mr. James D. Checki, Jr., argued the cause for complainant-respondent (Messrs. Checki and Politan, attorneys).
Mr. James A. Major, II, argued the cause for respondents-appellants (Messrs. Major and Major, attorneys).
G.H. BROWN, J.C.C.
The appeal was filed in this court on April 24, 1963, before the effective date of an amendment to section 21 of the Law Against Discrimination, N.J.S.A. 18:25-1 et seq. By that change the Superior Court, Appellate Division, instead of the County Court, now has the appellate jurisdiction. The matter remains here, however, pursuant to an order dated July 7, 1963.
Mrs. Delia David's complaint charging the appellants with an act of discrimination on December 13, 1962, under the act in its then form, was heard in a proceeding conducted by a hearing examiner for the Commissioner of Education in the Division on Civil Rights.
*595 On a record which included about 400 pages of transcribed testimony, the Commissioner adopted the hearing examiner's findings of fact and conclusions of law. In particular, it was determined that appellants denied Mrs. David, in violation of N.J.S.A. 18:25-12(g), the opportunity to apply for tenancy in one of their apartments because she was a Negress. An order by the Commissioner issued on April 19, 1963. It directed appellants to cease and desist from discrimination and it required them to follow designated rental procedures for a period of one year. Affirmative relief to Mrs. David was specifically withheld, however. She and her family had taken physical possession of the apartment which, through the time of the Division hearing, they continued to occupy without permission of the owner. The hearing examiner found that this so-called "sit-in" constituted self-help which "thwarted" the power of the Division to grant her the direct relief of enforced tenancy.
Appellants attacked the agency determination on the levels of fact and law. They contend there was no evidence to sustain the ultimate factual finding below. They challenge the constitutionality of the Law Against Discrimination on three grounds:
First, the statute attempts to create a court in the Executive Branch of the State Government contrary to Article III of the 1947 Constitution;
Second, it effects a taking of private property, contrary to Article I thereof; and
Third, it unlawfully discriminates between owners and renters of real property.
There is a cross-appeal by Mrs. David from the Commissioner's order for the reason that it did not compel a rental to her. In this aspect of the controversy, an appeal is now pending before the Appellate Division from a judgment ejecting the Davids. It was agreed on the argument of the present matter that the cross-appeal would not be pressed here, but without prejudice to the David position in the other appeal.
*596 By agreement of the parties the appeal to this court is being treated as a trial de novo on the record made in the Division, even though the superseded section of the law did not expressly direct a new adjudication of the facts. N.J.S.A. 18:25-21 now amended by L. 1963, c. 40 on May 21, 1963.
The report of the hearing examiner covers 40 pages. It contains an exceptionally thorough analysis of the testimony. I have studied the testimonial transcript and the following findings of fact are made independently of his.
Mrs. David learned from a newspaper advertisement that a six-room apartment was for rent at 2 Dempsey Avenue in Edgewater, Bergen County. She went to see it on Thursday, December 13, 1962. She met the superintendent, a Mrs. Edith Dagle (referred to as Mrs. Alfred Dagle in the complaint) at the premises. The latter told Mrs. David there was a prospective tenant who had come the night before and who would bring her husband to see the place that evening. Mrs. David offered to leave a check for $200 for one month's rent in advance and a month's rent as security. This was declined by Mrs. Dagle, who said she would have to consult the owner. Mrs. David left her telephone number.
Fifteen or twenty minutes after Mrs. David went out, a Mrs. Elliott and another white woman arrived. They asked to look at the apartment. Mrs. Dagle showed them through. They were told about the prospect who had appeared the night before and they were invited to give something to hold the apartment in case of her return. Mrs. Elliott deposited $10 for which she was issued a receipt. Mrs. Dagle did not mention Mrs. David.
What Mrs. Dagle did not know was that she had been drawn into a prearranged plan of action initiated by the Bergen County Chapter of the Congress of Racial Equality. A C.O.R.E. party was outside the apartment when Mrs. David made her rental application. Mrs. Elliott's subsequent entry was in the role of a "tester"  "to see if there is any difference in what is told to the two applicants."
*597 There is no need to search the record for Mrs. Dagle's personal position in the situation. She made it clear in her testimony:
"Q. Now, Mrs. Dagle, am I correct in saying that your testimony so far is that on Wednesday evening, if that lady had offered you a deposit, you would have accepted it?
A. Probably, yes.
Q. And that you did accept a deposit from Mrs. Elliott?
A. Yes.
Q. And that you didn't accept a deposit from Mrs. David?
A. Yes.
Q. And that you might have accepted a deposit from Mrs. David if she were white?
A. Probably."
Again:
"Q. And you told us, Mrs. Dagle, that if Mrs. David had in fact not been colored, you might have accepted or probably would have accepted the deposit?
A. Probably.
Q. And you did not want to accept on your own responsibility, to accept a colored person as tenant; is that correct?
A. That's right."
Mrs. Dagle testified that after accepting the Elliott deposit she telephoned Mrs. David to state that the apartment had been rented to someone else. Mrs. Dagle said this was done by her own initiative and without instruction. There can be no doubt that Mrs. Dagle, as an employee of the owner, did discriminate against Mrs. David because of her color "in the terms, conditions or privileges of the * * * rental * * * of * * * real property," contrary to N.J.S.A. 18:25-12(g)(2).
The question is whether a case has been made out against the other defendants. It is clear from the proofs that defendant Henry C. Senger, Jr., although serving as secretary-treasurer of the corporate defendant, Vesta Company, was its spokesman vis a vis Mrs. Dagle in the matter of rentals. Mrs. Dagle testified that she telephoned Mr. Senger when Mrs. David left the apartment. She informed him that two *598 Negro women had come to inspect it and they wanted to make a deposit, but that Mrs. Dagle had told them of the continuing interest of the prospective tenant who had seen the place the night before. Mr. Senger in his testimony confirmed this, except that he remembered something more Mrs. Dagle said. It was his recollection that Mrs. Dagle then told him the woman with Mrs. David
"* * * brought up a point of whether or not Mrs. Dagle would object to Negro tenants and Mrs. Dagle replied to her, she said. `No, not personally but I don't know how the other tenants would feel.' So I told Mrs. Dagle I think she did it properly."
Mrs. Dagle denied that she had reported this to Mr. Senger, although she testified that the incident actually had occurred.
The fact is that Mrs. Dagle did apprise Mr. Senger immediately of the David visit and the inquiry as to apartment policy. It was perfectly natural for the superintendent to seek specific instructions. She testified that she told Mrs. David she couldn't accept a deposit without consulting the owner because Mrs. David was colored  "It was a new experience to me and I didn't know." She did not want to accept a colored tenant on her own responsibility, she said. She gave Mr. Senger to understand that the policy issue had been precipitated in a "belligerent" manner, as Mr. Senger put it in his testimony.
Mr. Senger says that in the light of Mrs. Dagle's report of the David inquiry he told the superintendent only to wait and see whether the Wednesday evening prospect (whose name was unknown to Mrs. Dagle and who had left no deposit) returned. He said he gave her no instructions as to the Davids; he did not tell her not to rent to them; he did not tell her to telephone them, although he knew she had their number, and there was no discussion with her at all concerning his attitude as to renting to Negroes. Mrs. Dagle testified compatibly.
I am compelled to the conclusion that Mrs. Dagle made her telephone call to Mrs. David (stating the apartment had *599 been rented) as a result of what Mr. Senger said to Mrs. Dagle and that it was in fact his purpose to avoid the necessity of accepting the Davids because of their color. His explanation as to why Mrs. David was subordinated to the priority of the unnamed woman, whose renting interest the night before had been so casually manifested, seems to support an adverse inference on the issue. In the light of all the testimony, I find that he, too, acted in violation of the same section of the act and that he would therefore be culpable individually according to its terms.
Mr. Senger's de facto representation of the Vesta Company in the rental area amply appears from the record. Joseph T. Panucci, the vice-president of the corporation and one of the three principals thereof, testified as follows:
"Q. He [Mr. Senger] was the man, though, who Mrs. Dagle always called if there was a prospective tenant or some business having to do with this apartment. Correct?
A. That would seem to be the experience that we have had since we owned the building."
Although there was no proof of formal corporate action with respect to policy, the practical result must follow that Mr. Senger was the alter ego for the Vesta Company as a corporate entity. I therefore find that it has been brought within the ambit of culpability.
On the other hand there is no proof by which the defendants Joseph T. Panucci and John Lowe can be held personally responsible for the David transaction. They can only be held in on some theory of administrative convenience or guilt by agency. Even though it has been declared that the Law Against Discrimination is not strictly penal in nature, some more substantial connection between these persons and the forbidden conduct must be shown than was developed on this record in order to make them individually liable for what happened. The complaint is therefore dismissed as against defendants Panucci and Lowe.
One further fact is clear. Mrs. Dagle and Mr. Senger did not act toward Mrs. David with malice. There is nothing in *600 the record to show that she was personally objectionable. On the contrary, Mrs. Dagle said this was not so:
"Q. When Mrs. David came to look at the apartment, did you see anything objectionable to her as a tenant?
A. No. I thought she was rather attractive and very intelligent looking.
Q. Would she, in your opinion as a person who judges people who are coming to rent an apartment, would she make a good tenant?
A. Well, personally I think yes."
Mrs. Dagle reiterated her judgment:
"Q. Did you think on the 13th that Mrs. David was an acceptable tenant?

* * * * * * * *
A. Yes."
This good opinion of Mrs. David was communicated to Mr. Senger, the latter testified. Mrs. Dagle, in her telephone call, told him
"* * * a Negro lady had just been in to look at the apartment. She said she was a very nice lady, very polite, neat, and she had offered to put down a deposit of $200. on the apartment."
Mr. Senger got a good impression from what Mrs. Dagle told him. In answer to a question by the hearing examiner, Mr. Senger agreed that from the Dagle report Mrs. David appeared to be a desirable tenant.
The motivation for the exclusion of the Davids is not hard to find. It centered in an anxiety that admission of this Negro family to the tenant community at 2 Dempsey Avenue would jar the establishment. It is uncontradicted that Maggie Nealy, the Negro woman who accompanied Mrs. David to the apartment, flatly asked Mrs. Dagle whether she would have any objection to living in a house with Negroes. Mrs. Dagle testified as to her answer:
"THE HEARING EXAMINER: * * * she asked you in substance whether or not you had any objection to renting to colored people?
THE WITNESS: Yes.
*601 THE HEARING EXAMINER: And you said no?
THE WITNESS: Personally, no.
THE HEARING EXAMINER: And then what else did you say after that?
THE WITNESS: I said, `I didn't know about the tenants.'
THE HEARING EXAMINER: What did you mean you didn't know about the tenants?
THE WITNESS: I didn't know what their opinion might be."
Mrs. David remembered that Mrs. Dagle's words were "Not myself but the other tenants." Mrs. Nealy was in accord. And William Jackson, the Division's investigator, recalled that Mrs. Dagle told him her reply was
"* * * that she didn't have any objection but she didn't know how the other tenants would feel."
The point need not be labored. All agree that the superintendent expressed a concern about the reaction of the others living in the building. According to Byron M. Baer, vice-chairman of the Bergen County Chapter of C.O.R.E., Mrs. Dagle told him exactly why Mr. Senger would not rent to the Davids. His testimony as to her words was:
"Well, I asked the owner and he said, `No, because the other tenants would move'"
Mr. Baer went on:
"* * * and I asked her whether she meant that she could not rent to them because they were colored, and she said, `Yes,' and I said, `Because of what the other tenants would do?' and she said `Yes.'"
All of this must be considered against an undisputed background. There are eight residence units in the subject apartment building. Most of the tenants had been in occupancy for more than 32 years. To the knowledge of Mrs. Dagle, no colored people lived in the municipality. No Negroes had applied for an apartment in the house during the 32 years of Mrs. Dagle's residence there. The apartments were rented on month-to-month tenancies.
*602 The Law Against Discrimination was enacted in 1945 "for the protection of the public safety, health and morals and to promote the general welfare and in fulfillment of the provisions of the constitution of this State guaranteeing civil rights." N.J.S.A. 18:25-2. The purpose of the enactment is to compel a course of social conduct by which these good ends will be achieved. All economic areas are affected  employment, public accommodations and, since 1957, housing. The agency charged with administration of the Law is specifically empowered "to prevent and elimininate discrimination." It has been given "general jurisdiction and authority" for implementation. N.J.S.A. 18:25-6. Willful disobedience is punishable. N.J.S.A. 18:25-26.
In the realms of employment, public accommodations and public education, the statute requires no more than compliance with well-established instances of practice. Enlightened citizens, prior to 1945, set the standard for universal conduct. They were in the vanguard of the movement by which equal opportunity for all citizens will become a reality. Their business policy was in being before the Law Against Discrimination and constituted the precedent for social custom. If this sort of leadership was too rare, it was nevertheless real. The Legislature commanded all to follow the good example.
In the field of housing the facts of life have not been the same. Here the Legislature was confronted with a social pattern which had hardened out of long enduring folkways. As wrong as it may be, the actuality is that Negro families and white families have not resided under the same roof in privately owned and financed multiple-dwelling units. Color alone ought not to have accounted for this, but it did. At least as far as the Bergen County community is concerned, such was the fact in 1961, when non-public housing was first brought within the reach of regulation. There has been no significant change in mores to the present date.
This custom has been recognized by the Legislature. An adjustment to certain resulting necessities is evident in the *603 Law Against Discrimination as it now stands. In section 5 (n) it excepts from coverage the hard cases 
The rental, by the owner or occupant of a one-family accommodation in which he or members of his family reside, of a room or rooms in such accommodation to another person or persons.
The sale or rental of a one-family dwelling.
The sale or rental of a two-family dwelling.
The sale or rental of a three-family dwelling wherein the owner maintains his family household.
The law does not compel conduct in these areas unless such a building constitutes "a publicly assisted housing accommodation." That term is defined in the statute as including all housing built with public funds or public assistance, or financed by a loan guaranteed or insured for repayment by the Federal Government or one of its agencies. N.J.S.A. 18:25-5 (m). If the residence structure is privately financed, Negroes can be excluded.
The Supreme Court of New Jersey has made it clear why any "publicly assisted housing accommodation" must come within the sweep of the act. This is because such a classification is marked out by the application of an irrefutable principle. It was stated in Jones v. Haridor Realty Corp., 37 N.J. 384 (1962):
"Developers and owners who availed themselves of the [public] assistance obtained an added advantage in the housing market which they would not otherwise enjoy. * * * They were aided by the public credit which in the ultimate depends upon revenues of government having their source in all of the people, non-Whites as well as Whites." (at p. 390)
In the case of Levitt & Sons, Inc. v. Div. Against Discrimination, etc., 31 N.J. 514 (1960), the Supreme Court dealt with a facet of the housing problem. The plaintiffs there attacked the statute on the ground that because it was intended to eliminate discrimination in living accommodations it must apply to housing generally. (At this time the act did not cover privately financed housing at all). The *604 court rejected the argument. It was held that the statutory distinction then made between publicly assisted housing (which was regulated) and all other housing (which was not regulated) was not a palpably arbitrary distinction. In particular, it was the evident view of the court that the publicly assisted Levittown project for 16,000 houses was conducive to a proper legislative goal for easing the residential problem for minorities. The opinion points out, at page 533, that "the type of housing chosen is that most easily financed and as to which established patterns would least likely be disturbed."
It is this very fact of "established patterns" which injects difficulty into the case at bar. The established pattern of social conduct still works against the sharing of multipleunit private residential accommodations. This is so regardless of the size of the housing facility. The pattern is wrong. Experience shows that the existing pattern can be disrupted only by requiring a new policy. The vehicle for change must be overriding law.
Any tear in the status quo inevitably does damage to those who have relied upon it. However, the fact that some financial injury may be suffered by property owners affected by the Law Against Discrimination does not, by itself, signify an invasion of due process. Private property rights and the need for correction of public detriment are competing interests which must be weighed. Abridgement of private right may thus be justified. Jones v. Haridor Realty Corp., supra, at pp. 392, 394.
But the premise for the acceptability of these consequences is a valid classification. That has not been provided in the system framed for covering non-publicly assisted housing accommodations in subsection (n) of section 5 (N.J.S.A. 18:25-5). By its terms, only a portion of such housing is covered  in the main, multiple units for three or more tenant families are regulated as are developments consisting of ten or more separate dwellings.
A line of demarcation for classification need not be drawn at a point which is "mathematically exact." N.J. *605 Restaurant Assn. v. Holderman, 24 N.J. 295, 301 (1957). And:
"* * * it is not enough to demonstrate that the legislative objective might be more fully achieved by another, more expansive classification * * *
The Legislature may * * * limit its action upon a decision to proceed cautiously, step by step * * * because of practical exigencies * * *." (at page 300 of the same)
In the N.J. Restaurant Assn. case the foregoing were cited as some of the "flexible rules" for testing the propriety of classification. But it was nevertheless noted that distinctions must "be reasonably rooted in facts." (p. 301)
The Legislature, in its definition of "real property" in the Law Against Discrimination, obviously saw the need "to proceed cautiously." It took a step short of covering all privately financed housing. It must have regarded the prevailing custom of separate residence as a "practical exigency." That custom has for generations operated and still operates with respect to all rental property. The sudden command to abandon it produces an economic impact which evenly affects all owners of real property. They have been welded into a class by evolution of Anglo-Saxon law over the centuries and through the perpetuation of their rights by the New Jersey Constitution of 1776. They are similarly circumstanced in the special social context. To require some of them to bear the initial economic cost of a necessary reform while others may continue to follow the superseded tradition during a period of transition is to discriminate within the class unfairly.
The New York statute against discrimination embodies no such classification. That legislature has so far refrained from a limited entry into the ancient field of strictly private property. Section 18-e of the New York Civil Rights Law, McKinney's Consol. Laws, c. 6 (which became effective in 1950 by L. 1950, c. 287) expressly provides that its sanction "shall not apply to privately owned housing accommodations which are not publicly assisted * * *."
*606 The Superior Court, Chancery Division, recently had before it the case of New Jersey Home Builders Ass'n, etc. v. Division on Civil Rights, etc., decided November 13, 1963. It was held in the opinion that the New Jersey Law Against Discrimination is constitutional despite the stated exemptions from coverage. The distinctions in private housing were upheld because
"* * * the Legislature is aiming, at the present, toward the eradication of discrimination of that portion of private housing which, in some of its aspects, is colored by `public' considerations; for instance, the inclusion of ten or more dwellings in a contiguous area, and those dwellings containing accommodations for four or more families, or three or more families if the owner is not the occupant. Conversely, the law is geared to exclude dwellings where the owner occupant would be placed in a relative position of personal proximity to the buyer or tenant."
The nub of the problem is rooted in the fact implicitly recognized by the last sentence in the quotation  the universal social practice has been against what the court in that case referred to as "personal proximity" in housing. If this custom is wrong, as I believe it is, then the law should not be "geared" to force only some owners to move in counter-action. There is no way of subdividing equitably a class the entire membership of which is so equally steeped in a private property tradition and so identically affected by the impact of the mandate for reform.
It should be reiterated that the defect of the New Jersey Law Against Discrimination is not that it collides with a paramount private right to discriminate between prospective tenants. Its vice inheres in the unfair method chosen to change a community-wide practice by which white families and Negro families do not dwell under the same roof. Unfortunately, the practice is still viable. The norm for conduct should be conformity with the finest custom. To tolerate the citizen's doing less is to abandon the uplifting function of the law. To punish him for not doing more is hypocritical. Since the practical effect of the Law Against Discrimination *607 in its application to housing is to start a new way of life for the benefit of all citizens, then all citizens economically affected should enter the new era together.
For the foregoing reasons, the classification (by which the premises of defendant Vesta Company are brought within regulation) is invalid and the New Jersey Law Against Discrimination is to that extent unconstitutional.
The complaint is dismissed.