# Huber v. Pennsylvania Human Relations Commission

438

*Robert F. Jackson,* for appellants.

*Nathan Agran,* for appellee.

HERMAN, J., May 29, 1967.—This is the appeal of Kenneth J. Huber and Charles W. Huber from the decision and final order of the Pennsylvania Human Relations Commission,[1] which determined, inter alia, that the Hubers committed unlawful discriminatory practices under section 5(h) of the Pennsylvania Human Relations Act in that they refused to rent commercial housing to James C. Sampson and Geraldine M. Sampson, Negroes, because of their race; and further, that the said Hubers maintain a policy of refusing to rent commercial housing to Negroes because of their race. The final order of the commission then directed respondents-appellants (Hubers) to cease and desist from this unlawful discriminatory practice; to offer to rent to the Sampsons premises No. 148 Third Avenue, Newtown Square, Delaware County, Pa., for a term of one year at the monthly rental of $135; to comply with the Pennsylvania Human Relations Act, and to take other affirmative action.

Appellants contend that the Pennsylvania Human Relations Act of October 27, 1955, P. L. 744, sec. 1, as amended by the Act of February 28, 1961, P. L. 47; sec. 1, 43 PS §951 et seq. (hereinafter referred to as the "act") is unconstitutional; first because the act and amendments were passed by legislatures which were malapportioned as to these appellants and thus

---

[1] Irving A. Miller, another respondent against whom the decision and final order applied, did not appeal.

denied them the equal protection of the laws and due process of law; that the act itself violates the guarantee of the Fourteenth Amendment to the Constitution of the United States as to equal protection and due process [2]; and, secondly, because it violates article I, sec. 1, and article I, sec. 10, of the Pennsylvania Constitution.[3] Appellants further contend that the decision and order are void because they are based on findings of fact that were not supported by substantial evidence. Finally, appellants complain that Kenneth J. Huber was not properly served with the complaint and notice of hearing before the commission, and that Charles W. Huber was improperly made a party to the proceedings at the time of and during the hearing.

We shall consider the procedural matters first. Complaint by Geraldine M. Sampson was made against Irving A. Miller, realtor (who did not appeal from the decision and order of the commission), and Kenneth J. Huber, owner, on June 10, 1966. On June 17, 1966, Carl T. Jones, field representative for the Human Relations Commission, served copies of the notice of hearing, presumably with copies of the complaint,[4] on one Thomas Surbani, a tenant-resident of 4223 West Chester Pike, Newtown Square, Pa., the resi-

---

[2] "[N]or shall any State deprive any person of . . . property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws".

[3] "All men . . . have certain inherent and indefeasible rights, among which are those of . . . acquiring, possessing and protecting property . . .": Article I, sec. 1, Pennsylvania Constitution.

"[N]or shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured": Article I, sec. 10, Pennsylvania Constitution.

[4] See copy of letter from the chairman of the board attached to the record in front of the notes of testimony. The objection was only to the manner of service and not the contents of papers served.

dence of Kenneth J. Huber, with instructions to give one copy to Kenneth J. Huber and one to Charles W. Huber, the latter of whom was not then named as a party-respondent. The complaint was amended, on June 21st, to include the name of James C. Sampson, the husband, as a complainant, and three days later an answer was filed which was signed and sworn to by not only Kenneth J. Huber, who complains about the service, but also by Charles W. Huber, who was still not named as a party.

At the hearing before the commission on June 27th, Kenneth J. Huber appeared personally and by counsel, and Charles W. Huber was personally present and testified. On or about July 11, 1966, Charles W. Huber filed with the commission another answer to the complaint denying any unlawful discriminatory practice and attacking the constitutionality of the Pennsylvania Human Relations Act. At the same time, Kenneth J. Huber filed an amended answer raising the same constitutional question.

The Human Relations Act provides simply that "the Commission shall cause to be issued and served a written notice, together with a copy of . . . [the] complaint": Section 9, 43 PS §959. The regulations duly adopted by the commission, pursuant to authority granted to it in the act, provide that notice of the hearing may be served personally or by registered mail: Section 105.02. The Administrative Agency Law of June 4, 1945, P.L. 1388, sec. 31, states only that a party must be "afforded reasonable notice of a hearing and an opportunity to be heard": 71 PS §1710.31. Under all the facts in this case, we conclude that both Hubers had adequate notice of the hearing before the commission, and the objection to the notice has no merit.

Although Charles W. Huber was not named as a respondent in the complaint, he apparently assumed

that he was a respondent, for he promptly swore to and filed an answer. Thereafter, at the hearing which he attended and sat at counsel table, he was made a party by the commission. It was clear that, in the investigation by the commission representative prior to the hearing, which investigation is required by the act, Charles W. Huber at all times represented himself as the responsible party concerned with the rental of the premises in question, if not the record owner. At the hearing, although counsel for Kenneth J. Huber, who stoutly maintained he did not represent Charles W. Huber, urged that Charles W. Huber be not made a party to the proceeding and, after he was made a party, that the hearing should be continued until he could retain counsel, Charles W. Huber himself made no objection to his being made a party-respondent; and after the commission had put in its case, he took the stand, and, on being interrogated by Kenneth J. Huber's counsel, he testified at length concerning the property in question, the refusal to rent to the Sampsons, the role he played in the matter, and what he and his son would do in the future about rental of the premises to the Sampsons. Thereafter, as hereinbefore mentioned, he filed another answer.

Of course, a person whose property or contract rights will be adjudicated in a proceeding before an administrative agency should be made a party to the proceedings, but it is not necessary that he be made a party in the pleading stage, if, when he is properly made a party, he has an opportunity to be heard. An analogous situation, in actions at law, is provided for in Pennsylvania Rule of Civil Procedure 2232(c); Goodrich-Amram §2232(c)-1, points out that a new party may be added at any stage in the action, during trial, or even after testimony is closed.

"It has been said that the most important characteristic of *pleadings* in the administrative process is

their *un*importance. In proceedings before administrative authorities, the strict rules of pleading and practice applicable to common-law actions do not apply . . .": 1 P.L. Encyc., Administrative Law and Procedure §38 (1957). (Italics supplied.)

The Superior Court, in Byers v. Pennsylvania Public Utility Commission, 176 Pa. Superior Ct. 620, 624 (1954), said:

"We have stated 'that it is the duty of the administrative boards to hold fair and open hearings and to give notice so that those interested may have an opportunity to be heard and the rudiments of fair play' be observed".

In our judgment, under all the circumstances of this case, the rudiments of fair play were observed, and Charles W. Huber should be considered a respondent in this case.

We now turn our attention to the constitutional questions raised by respondents, hereinafter sometimes called appellants. The first constitutional question raised is: Were these respondents denied the equal protection of the law and the due process of law because of the malapportionment of legislatures which passed the Pennsylvania Human Relations Act and the pertinent amendments thereto? We must answer this question in the negative.

Appellants have presented no authority for their position, and we believe none exists, and this failure in itself should be enough to deter a lower court from declaring an act of the legislature unconstitutional. There is, we believe however, authority based on logic and good reasoning contrary to appellants' contention.

If there were no other reason to support the validity of the acts of the legislature, the de facto doctrine which has been ingrafted upon our law would be sufficient. It is clear that officials elected under laws later

declared unconstitutional are de facto officers and their acts performed prior to the determination of the invalidity of the laws under which they were elected are valid as to third parties: 43 Am. Jur., Public Officers, §470, et seq.

Baker v. Carr, 369 U. S. 186 (1961), cited by appellants, held, as far as we are here concerned, only that the claim that malapportioned legislatures denied equal protection of the laws presented a justiciable issue which could be entertained in the Federal courts, but did not touch on the effect of a declaration that a State Constitution or State laws apportioning a State legislature were unconstitutional.

In Reynolds v. Sims, 377 U. S. 533 (1963), a case in which the United States Supreme Court found that the then existing apportionment laws of the State of Alabama were unconstitutional, and that the two plans proposed by the State legislature to correct this failed to cure the unconstitutional elements, the court, nevertheless, approved the district court's action in denying to the complainants immediate relief from the unconstitutional malapportionment, and thus permitted the malapportioned legislature to continue to function until a constitutional apportionment could be achieved: Pages 585-86. Thus, at least sub silentio, the United States Supreme Court held that the acts of such a malapportioned legislature would not, because of such malapportionment, be unconstitutional.

The Pennsylvania Supreme Court, in Butcher v. Bloom, 415 Pa. 438 (1964), and 420 Pa. 305 (1966), inferentially held the same way:

"It is obvious that the Pennsylvania Legislature cannot properly act to reapportion itself in the short time remaining before the election of November 3, 1964, and months after the April 28, 1964 primary election. We do believe, however, that the Legislature made an earnest effort to reapportion itself in 1963.

Unfortunately, it was then without the benefit of the views of the Supreme Court of the United States expressed in the Reynolds cases and without an interpretation by this Court of important and relevant provisions of the Pennsylvania Constitution. Serious disruption of orderly state election processes and basic governmental functions would result from immediate action by any judicial tribunal restraining or interfering with the normal operation of the election machinery at this late date. The Legislature should not be denied a reasonable opportunity to enact new reapportionment legislation. We therefore hold that the 1964 election of Pennsylvania legislators should and must be conducted pursuant to the Acts of January 9, 1964, Nos. 1 and 2. Under no circumstances, however, may the 1966 election of members of the Pennsylvania Legislature be conducted pursuant to a constitutionally invalid plan": 415 Pa. 438, 459-60 (1964).

"We determined, however, that *the imminence of the 1964 general election required the utilization of the apportionment plans contained in those acts, notwithstanding their invalidity, in order to prevent serious disruption of election processes and essential governmental functions . . .*": 420 Pa. 305, 307-08 (1966). (Italics supplied.)

See also United States v. Commonwealth of Pennsylvania, 214 F. Supp. 913 (W. D. Pa., 1963), a habeas corpus matter, in which a prisoner in the State correctional institution sought release on the ground that the legislators who enacted the statute by which he was convicted were elected illegally, because the General Assembly had not reapportioned itself according to law. The relief was denied principally on the de facto principle.

There is no merit in appellants' position on this ground.

The other constitutional question raised by appellants concerns the Pennsylvania Human Relations Act itself as distinct from the legislature that passed it.

Appellants argue that the act denies them the equal protection of the law and the due process of law, as guaranteed to them by the Fourteenth Amendment to the Constitution of the United States; and, further, that it violates the Pennsylvania Constitution in that it denies them the right of acquiring, possessing and protecting property, and takes their property without authority of law. We find no merit in these contentions.

The Pennsylvania Human Relations Act was designed, inter alia, "to assure equal opportunities to all individuals and to safeguard their rights at places of public accommodation and *to secure commercial housing* [5] *regardless of race,* color, religious creed, ancestry or national origin" (section 2(b), 43 PS §952), and section 2(c) proclaims that "This act shall be deemed an exercise of the police power of the Commonwealth for the protection of the public welfare, prosperity, health and peace of the people of the Commonwealth of Pennsylvania". (Italics supplied.)

The act then, in section 5, 43 PS §955, provides, in pertinent part, that "It shall be an unlawful discriminatory practice . . . (h) For any person to: (1) Refuse to sell, lease, finance or otherwise to deny or withhold commercial housing from any person because of the race, color, religious creed, ancestry or

---

[5] Section 4(j) of the act, 43 PS §954: "The term 'commercial housing' means housing accommodations held or offered for sale or rent (1) by a real estate broker, salesman or agent, or by any other person pursuant to authorization of the owner; (2) by the owner himself; or (3) by legal representatives, but shall not include any personal residence offered for sale or rent by the owner or by his broker, salesman, agent or employe".

national origin of any prospective owner, occupant or user of such commercial housing".

The police power of a state is very broad and transcends all other powers. It may embrace the protection of the lives, health and property of its citizens, the maintenance of good order and the preservation of public morals; and laws enacted pursuant thereto can only be set aside where it is clear that they have no legal or substantial relation to the subject or are an invasion of a right secured by fundamental law.

A state may regulate business and may limit the enjoyment of personal liberty or property, for there is no unqualified right to acquire, possess or enjoy property, if the exercise of the right is inimical to the fundamental precepts underlying the police power: Commonwealth ex rel. Woodside v. Sun Ray Drug Company, 383 Pa. 1 (1955); Gambone v. Commonwealth, 375 Pa. 547 (1954); 7 P. L. Encyc., Constitutional Law, §3 (1958).

The legislature has declared that "The practice or policy of discrimination against individuals or groups by reason of their race, color, religious creed, ancestry, age or national origin is a matter of concern of the Commonwealth. Such discrimination foments domestic strife and unrest, threatens the rights and privileges of the inhabitants of the Commonwealth, and undermines the foundations of a free democratic state . . .": Section 2, 43 PS §952.

It has frequently been held in this Commonwealth that the exercise of the police power will be held valid, even though it may interfere with property or contract rights, if such exercise of the police power bears a real and substantial relationship to the general welfare of the public and is not unreasonable or arbitrary. The property rights guaranteed by the Fourteenth Amendment of the Constitution of the United

States are subject, of course, to a proper exercise of the police power.

It is our opinion that it is a proper exercise of the police power of the Commonwealth for the legislature to prohibit discrimination in leasing, selling or financing of commercial housing against any person because of race, color, religious creed, ancestry or national origin, and that the prohibition in this act does not violate the Fourteenth Amendment of the Constitution of the United States.

The conclusion we have reached here has also been reached by the following appellate authorities when considering similar civil rights legislation in the field of housing (Porter v. City of Oberlin, 1 Ohio St. 2d 143, 205 N. E. 2d 363 (1965); David v. Vesta Co., 45 N. J. 301, 212 A. 2d 345 (1965)), where due process, equal protection, involuntary servitude and separation of powers were fully discussed: Colorado Anti-Discrimination Comm'n v. Case, 380 P. 2d 34 (1962); Massachusetts Comm'n against Discrimination v. Colangelo, 344 Mass. 387, 182 N. E. 2d 595 (1962); Jones v. Haridor Realty Corp., 37 N. J. 384, 181 A. 2d 481 (1962). See also Antidiscrimination Commissions, 74 Harv. L. Rev. 526-86 (1961); Racial Discrimination in Housing, 107 U. Pa. L. Rev. 515-25 (1958-59). For analogous persuasive cases see District of Columbia v. John R. Thompson Co., Inc., 346 U. S. 100 (1952); Railway Mail Association v. Corsi, 326 U. S. 88 (1944); Warren v. Philadelphia, 382 Pa. 380 (1955).

Article I, sec. 10, of the Constitution of Pennsylvania, as far as it pertains to the issue before us, deals with eminent domain and not the exercise of the police power, which we have concluded the act in question involves. The act does not violate article I, sec. 10, of the Constitution of Pennsylvania. See White's Appeal, 287 Pa. 259 (1926).

Appellants' argument that the act deprives them of the right of acquiring, possessing and protecting property is without merit. Indeed, it is the person allegedly discriminated against who is deprived of the right of acquiring or possessing property if the Human Relations Law were struck down.

We conclude that the anti-discrimination in commercial housing provision of the act does not violate the Pennsylvania Constitution.

This brings us to a consideration of the merits of the case.

It has been established by a great many cases[6] that the findings of fact on which an administrative agency such as the Pennsylvania Human Relations Commission bases its orders must be supported by "substantial evidence". They must be supported by such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

The commission made 19 findings of fact and reached 10 conclusions of law. Appellants except to findings of fact 4, 8, 14, 15, 16, 17, 18 and 19, and to conclusions of law 5, 6, 7, 8 and 9.

The exception to finding of fact no. 4 is well taken, as far as that finding speaks of Charles W. Huber as being the "true owner of premises No. 148 Third Avenue, Newtown Square", the premises in question. But that erroneous statement is not necessary in arriving at any of the conclusions of law, except as to the iden-

---

[6] Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197 (1938); Pa. State Board of Medical Education and Licensure v. Schireson, 360 Pa. 129 (1948); Shenandoah Suburban Bus Lines, Inc., Case, 355 Pa. 521 (1947); P.L.R.B. v. Kaufmann Dept. Stores, Inc., 345 Pa. 398 (1942); Ruettger v. Pa. P.U.C., 164 Pa. Superior Ct. 388 (1949); Matylewicz v. Hudson Coal Co., 53 Lack. 9 (1951); McPherson v. Connellsville Joint School Board, 81 Dauph. 298 (1963); Sanitary Water Board v. Boro. of Coudersport, 81 Dauph. 178 (1963); State Real Estate Comm'n v. Radnor Real Estate, Inc., 75 Dauph. 180 (1960).

tical phrase found in conclusion of law no. 3, to which no exception was taken. Neither of these erroneous statements are necessary to support the adjudication of the commission as we herein modify it. Finding of fact no. 8, and conclusion of law no. 7, deal only with Irving Miller, the respondent who did not appeal, and, consequently, this finding of fact and conclusion of law are completely unnecessary to the adjudication as herein modified.

The evidence adduced at the hearing before the commission may be fairly summarized as follows:

Judith Jennings, a real estate agent representing the Negro complainants James C. and Geraldine M. Sampson, who desired to rent a single dwelling, ascertained that Irving Miller, a real estate broker, had available the premises in question, 148 Third Avenue, Newtown Square. Said premises were vacant and were for rent on a yearly basis at a rental of $135 per month with the requirement that one month's rental be paid in advance and that $100 be advanced as security.

Mrs. Sampson desired to rent the property on the terms established by the owners, and presented herself with Mrs. Jennings, the real estate agent, to Miller, gave him her check for $235 payable to Kenneth Huber, as directed, and asked for a year's lease, also indicating a willingness to pay the entire year's rental in advance if necessary. When Miller saw Mrs. Sampson, and thus discovered that she was a Negro, he indicated that he would have to talk to the owners before giving the Sampsons a lease, stating that he did not know whether the owners would rent to a person of the Negro race. The following day a *month-to-month lease* which could be terminated on a notice of 30 days (rather than a year's lease which had been offered before the race of the Sampsons was known) was tendered to Mrs. Sampson. Upon Mrs. Sampson's

query, she was told that the owner now desired to sell the property and for that reason would not execute a year's lease. In spite of the short term, Mr. and Mrs. Sampson executed the lease and returned it to Miller on June 4th, three days after the first visit to the Miller office. They were *then* told that an investigation must be made of their credit, and, accordingly, Mrs. Sampson gave Mr. Miller $10 for such investigation. On June 8th, when Mrs. Sampson requested of Miller the keys to the premises and the lease, she was told that the lease and the credit report were in the hands of Kenneth Huber. Having ascertained from the credit bureau that her credit report was favorable, Mrs. Sampson again contacted Miller who advised her, on June 9th, that the lease executed by the Sampsons had been mailed to Kenneth Huber several days earlier and that he, Miller, had received no reply. Then, on June 10th, Mrs. Sampson received a letter from Miller, enclosing a note dated June 8th which *he* had received from Charles W. Huber, saying that on the basis of the credit report he would not rent the premises to the Sampsons. Miller also returned the Sampsons' $235 check. On June 11th, after the receipt of Miller's letter, the note of Charles W. Huber, and her check, Mrs. Sampson called Kenneth Huber on the phone and, after an extended conversation, during which she told him that she and her husband were all packed and ready to move, and that they were willing to pay an entire year's rent in advance, Huber, not refusing the rental, took her phone number and said he would "call her back". He never returned the call.

When, as required by the Human Relations Act, after a complaint is filed, an investigation was begun, the investigator was never able to meet with Kenneth Huber, although he tried to arrange such a meeting. He did, however, meet with Charles W. Huber on June 14th. He informed Charles W. Huber of the nature of

the Sampson's complaint, and Huber, according to the investigator, gave as the reason he refused to rent the premises to the Sampsons that he had already, *on June 7th*, rented these premises to one Fred Dager, a former employe.

When the investigator asked to examine the purported lease to Dager, Charles W. Huber made an excuse for failing to produce it and, in fact, *never* produced it for inspection before the hearing, nor at the hearing. Investigation further revealed that the Hubers through a real estate broker (other than Miller, who had been replaced after he had prepared a month-to-month lease for the Sampsons) were still attempting to lease the premises after the 7th, the date Charles W. Huber indicated they had already been rented to Dager. In fact, on June 17th, a lease for these same premises was prepared by the new broker, and submitted to one James C. Brown, and Judith his wife, members of the Caucasian race, as proposed tenants. This lease was for the term of one year and at the same rental as quoted to the Sampsons. Later, when Charles W. Huber testified at the hearing before the commission, he attempted to clarify his position, but his testimony was weak, vacillating and contradictory. For example, when his counsel asked him about the request for a credit report on the Sampsons, he replied, almost unintelligibly:

"Well, he [Miller the real estate broker] told me that Mrs. Jennings came there and picked up the key to the property and explained it, which has been testified.

"And she came back later with a Mrs. Sampson who was a colored person, and he asked me was I willing to rent to a colored person.

"I never said I wasn't. I said the only thing—which I think should be, is customary, and I thought they did, I don't know. I have other brokers that handle prop-

erties for me and nobody rents a property unless I get a credit investigation": N. T. 108.

On crossexamination, when asked why he had requested a credit investigation on the Sampsons, when it was not clear whether he had asked for similar credit investigations on other would-be tenants, he replied:

"A. For the simple reason I wanted to know, that's all.

"Q. Did it have anything to do with the fact the persons who were seeking this property were Negroes?

"A. Probably somewhat . . .": N. T. 120.

At N. T. 121, he admitted that he had instructed Miller to write the lease for the Sampsons on a month-to-month basis, explaining that he had decided to sell the property and consequently did not want a tenant for a long period. Then, at N. T. 123, he testified that Gilbert, his new real estate broker, had offered a six-month lease to the Browns (actually it was for one year, as we have previously seen), apparently with his consent. He also testified that on the Saturday after the commission's investigator had talked with him about the Dager lease, Dager and his wife decided not to take the property. By calculation, not disputed, Saturday would have been June 18th, the lease offered to the Browns was dated June 17th, a time when, according to his testimony, the property was already rented to Dager.

Mrs. Brown testified that it was on June 15th that she first talked to Gilbert, the real estate broker, and two days later she was offered a lease for one year. It developed later that the Brown's were not bona fide applicants for rental, and they did not rent the premises. At the time of the hearing before the Commission, the premises were still vacant.

The credit report of "Philadelphia Suburban Credit Bureau", on which Huber purportedly relied, and which was offered in evidence and made an exhibit, shows that the Sampsons own two properties in Philadelphia, from which they receive $365 per month rent, and another in Atlantic City, from which they receive $135 per month rent; that they recently sold their home in Philadelphia, from which they would presently move; that their "worth" was approximately $40,000; that James C. Sampson is steadily employed, having worked for the same window washing company for 25 years; that Mrs. Sampson had worked for the Federal government for 21 years, but was presently on disability compensation; that their reputation in the neighborhood was satisfactory, and that nothing detrimental concerning their habits and morals was discovered. As against this favorable report, two banks indicated that on two small personal loans made in 1961, the Sampsons had been slow in their payments and for this reason had later been denied credit.

While further testimony from their bookkeeper, concerning the Sampsons' prompt payment of their debts and their net worth, would normally be irrelevant, for it would not matter how good their credit actually was, if Huber honestly relied upon and acted upon the credit report he had received, in the instant case testimony of their good credit and prompt payment is important in view of the later testimony of Charles W. Huber.

At the close of Huber's examination, he acknowledged that the premises were still vacant, and that he had no tenant, but, even though he had then heard the testimony that the Sampsons' net worth was $26,000, and that they promptly paid their bills, he would not rent to them for a six-month term, even though they paid the entire rental in advance, until he had talked

to his son Kenneth. When offered the opportunity to talk to his son Kenneth, who was present in the room, he then decided he could not rent to the Sampsons until he had also talked to his lawyer, who was not present.

In view of the basically good credit report, supported by the additional evidence of prompt payment of their bills by the Sampsons, no reasonable person could conclude that poor credit was the reason the Hubers did not rent the premises to them.

All of the findings of fact [7] on which the Human Relations Commission based its order, as we herein modify it, were adequately supported by substantial

---

[7] Findings of Fact:

"14. On June 14, 1966, the respondent owner, acting by and through his father and agent, Charles W. Huber, claimed that he refuses to rent the said property to the complainants, because said property had already been rented to an employe, whereas in fact said property had not been rented to such employe.

"15. On June 14, 1966, the respondent owner, acting by and through his father and agent, Charles W. Huber, asserted that he refuses to rent the property in question to the complainants, because the complainants are a poor credit risk, whereas in fact the complainants are a good credit risk.

"16. The respondents had no reasonable explanation for refusing a bona fide offer to rent said premises, No. 148 Third Avenue, Newtown Square, Delaware County, Pennsylvania, to the complainants.

"17. On or about June 9, 1966, the respondents, Kenneth J. Huber and Charles W. Huber, attempted to rent said premises, No. 148 Third Avenue, Newtown Square, Delaware County, Pennsylvania, to a white tenant, through a different real estate broker, the firm of Gilbert Real Estate.

"18. The respondent owner has at all times since June 1, 1966, and is presently attempting to secure a white tenant for the said premises, No. 148 Third Avenue, Newtown Square, Delaware County, Pennsylvania.

"19. At all times herein mentioned, the respondents maintained and still maintain a policy of refusing to rent premises No. 148 Third Avenue, Newtown Square, Delaware County, Pennsylvania, to Negroes because of their race".

relevant evidence, and evidence that a reasonable mind might accept as adequate to support a conclusion. The conclusions of law nos. 8 and 9 [8] are naturally arrived at from the said findings of fact.

For the reasons set forth at length herein, we make the following

ORDER

And now, May 29, 1967, the appeal of Kenneth J. Huber and Charles W. Huber is dismissed, and the modified adjudication is affirmed, as follows:

1. Kenneth J. Huber and Charles W. Huber, their agents, representatives and employes shall cease and desist from

(a) Refusing to rent to James C. Sampson and Geraldine M. Sampson, because of their race, premises No. 148 Third Avenue, Newtown Square, Delaware County, Pa.;

(b) Maintaining a policy of refusing to rent to Negroes because of their race, housing accommodations now or hereafter owned or controlled by the respondents.

2. Kenneth J. Huber shall offer to rent to James C. Sampson and Geraldine M. Sampson, forthwith, in

[8] "8. On June 9, June 14 and thereafter, the respondents, Kenneth J. Huber and Charles W. Huber, committed unlawful discriminatory practices, under section 5(h) of the Pennsylvania Human Relations Act, in that they instructed their real estate agent to submit a month-to-month lease to the complainants, because the complainants were Negroes, in that respondents refused to rent commercial housing to the complainants, James C. Sampson and Geraldine M. Sampson, because of their race, and denied and withheld commercial housing from the complainants, James C. Sampson and Geraldine M. Sampson, because of their race.

"9. The respondents committed unlawful discriminatory practices under section 5(h) of the Pennsylvania Human Relations Act, in that respondents maintained and still maintain a policy of refusing to rent commercial housing to Negroes because of their race".

writing, premises No. 148 Third Avenue, Newtown Square, Delaware County, Pa., for the term of one year, at the monthly rental of $135. A copy of such written communication shall be transmitted to the commission by the said Kenneth J. Huber.

3. The said Kenneth J. Huber and Charles W. Huber shall rent all housing accommodations subject to the Pennsylvania Human Relations Act, located in the Commonwealth of Pennsylvania, now or hereafter owned, built or controlled by them, without regard to the race, color, religious creed, ancestry or national origin of applicants for such housing.

4. The said Kenneth J. Huber and Charles W. Huber shall apply the same standards, terms, conditions and privileges in the sale or rental of any such housing accommodations to all applicants for such housing regardless of their race, color, religious creed, ancestry or national origin.